815 P.2d 900

**SALT RIVER PIMA–MARICOPA INDIAN COMMUNITY, a federally recognized Indian community, Petitioner,**

v.

**Honorable Alfred J. ROGERS, Judge of the Maricopa County Superior Court, Respondent,**

**PHOENIX NEWSPAPERS, INC., an Arizona Corporation and Kerry Fehr, Respondents/Real Parties In Interest.**

No. CV–91–0005–SA.

Supreme Court of Arizona, En Banc.

July 25, 1991.

Reconsideration Denied Sept. 24, 1991.

Shea & Wilks by Philip J. Shea, Phoenix, for petitioner.

Gust, Rosenfeld & Henderson by James F. Henderson, Patricia A. Sallen, Phoenix, for respondents and real parties in interest.

OPINION

FELDMAN, Vice Chief Justice.

In this special action proceeding, the Salt River Pima–Maricopa Indian Community (the Community) seeks to prevent the state treasurer from disclosing a check distribution list that contains personal information about the Community's members. The list was found in the treasurer's office, though it is not part of his records. The Community brought this action after obtaining a stay of the superior court's judgment ordering the treasurer to disclose the list to Phoenix Newspapers, Inc. and reporter Kerry Fehr (collectively Phoenix Newspapers). The sole issue before us is whether the check distribution list is a "public record" or "other matter" of the state of Arizona and therefore subject to disclosure under Arizona's Public Records Law, A.R.S. §§ 39–121 through 39–121.03. We have jurisdiction pursuant to article 6, § 5(1) of the Arizona Constitution, and Rule 8(b), Ariz.R.P.Spec.Act., 17B A.R.S.

FACTS AND PROCEDURAL HISTORY

This case arises out of the state's attempt to acquire a right-of-way through reservation lands for construction of the Pima Freeway. The Arizona Department of Transportation (ADOT) negotiated with the Community to purchase a right-of-way across both tribal trust land and trust land individually allotted to tribal members.[1] This case thus involves a unique intersection of federal and state law. The document in question was physically located in the treasurer's office, and disclosure is sought under the Arizona public records statute. The content of the document, however, pertains to tribal land interests that are recorded only in the Bureau of Indian Affairs (BIA) Land Titles and Records Office and thus constitutes federal-tribal information. An overview of the relevant facts and law leading to the special action is therefore necessary to understand the issue in this case.

A. The Federal Statutory and Regulatory Scheme

The Community is a federally recognized Indian tribe organized under Section 16 of the Indian Reorganization Act of June 18, 1934 (the IRA), 48 Stat. 987, 25 U.S.C. § 476. In this respect, the Community exercises its sovereign governing powers within the framework established by federal statute. *See Tracy v. Superior Court,* 168 Ariz. 23, 29–30 n. 6, 810 P.2d 1030, 1036–37 n. 6 (1991). The Community has possession and control of lands reserved to it by Presidential Executive Order. 1 C. KAPPLER, INDIAN LAWS AND TREATIES 806–07 (2d ed. 1904). Under the IRA, the Community has the power to "prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments." 25 U.S.C. § 476. Thus, the state's power of eminent domain does not extend to the land in question. Although the Community possesses the power to negotiate with a state agency, the United States holds title to reservation lands as trustee for the Community. Any disposition of tribal land must therefore be conducted in accordance with federal law. *See Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 670–71, 94 S.Ct. 772, 778–79, 39 L.Ed.2d 73 (1974); *see generally* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 508–28 (1982).

Under federal law, a right-of-way across trust land may be granted only by the Secretary of the Interior (the Secretary), acting for the United States and on behalf of the tribe. 25 U.S.C. § 323. Compensation for such a right-of-way must be "not less than but not limited to the fair market value of the rights granted, plus severance damages, if any, to the remaining estate."

---

1. In the early 1900's, pursuant to the Indian General Allotment Act (25 U.S.C. § 331 *et seq.*), parcels of reservation land were allotted to individual members of the Community. Although the individual allottee enjoys beneficial ownership of the land, legal title is held by the United States, as trustee. In this respect, the legal status of allotted trust land, with respect to alienation by sale, lease, or easement, is virtually the same as that of tribally-held trust land. *See generally* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 612–19 (1982).

25 C.F.R. § 169.12 (1990). No right-of-way may be granted across the lands of individual allottees without the consent of a majority of the affected landowners. 25 U.S.C. § 324. After an agreement is reached as to compensation, the consideration is paid as a lump sum to the Secretary. 25 U.S.C. § 325 (compensation is to be received by Secretary on behalf of Indian owners); *see Pueblo de San Felipe v. Hodel,* 770 F.2d 915 (10th Cir.1985) (Secretary has discretion to set up escrow condition in right-of-way transaction). Any subsequent distribution to individual allottees becomes the duty of the Secretary and is conducted pursuant to the regulations of that office. 25 U.S.C. § 325.

The Indian tribe must consent to the final agreement before the grant may issue. 25 U.S.C. § 476. However, the Secretary maintains direct control over the transaction and generally delegates a significant portion of the responsibility to the BIA pursuant to 25 U.S.C. § 1a. Under the Indian Self–Determination Act, and in accordance with the long-standing policy of Congress to promote tribal self-determination, a tribe may contract with the BIA to assume direct control of such a transaction. 25 U.S.C. § 450f; 25 C.F.R. § 271.12. In this case, the Community contracted with the BIA to manage its tribal lands, including all functions associated with the grant of right-of-way and subsequent disbursement of funds to the individual allottees. *See* State Attorney General's Responsive Memorandum in the Superior Court at 3–4 (Memorandum), Exh.J. Under such a contract, the tribe must act in accordance with the federal statutes and regulations that normally govern the program or transaction involved. *See, e.g.,* 25 C.F.R. § 271.51 (imposing the BIA procurement regulations on tribal contractors); § 271.56 (imposing constraints of the federal Privacy Act, 5 U.S.C. 552a, on tribal contractors).

B. The Negotiations and Right-of-Way Agreement Between the Community and ADOT

In 1989, in connection with ADOT's survey and appraisal of lands involved in the right-of-way transaction, ADOT requested from the Community a complete title report on all the allotments in the right-of-way. ADOT letter dated July 21, Memorandum Exh.C. Tribal land records are normally held by the tribe and recorded only in the BIA Land Titles and Records Office serving the tribe's area. 25 C.F.R. § 150.3. Thus, such title reports are federal and tribal records and are accessible to the public only through federal statutory avenues or in the discretion of the BIA. 25 C.F.R. § 150.11. The BIA contract under which the Community assumed the duties relevant to the right-of-way transaction required the Community to comply with the Privacy Act, 5 U.S.C. § 552a, and its accompanying regulations, set forth at 43 C.F.R. § 2.45. *See* 25 C.F.R. § 271.56(a).

In light of this federally-imposed responsibility, the Community initially declined to release its confidential tribal land records to ADOT. Interoffice Memo, Memorandum Exh.B. The Community finally released the records to ADOT after receiving a detailed justification of ADOT's need for the information, along with express written assurances that ADOT and its consultant would respect the confidentiality of the information and that the information would remain the property of the Community. Memorandum Exh.C. ADOT and its appraisal consultant, DeLeuw, Cather & Co., used the information from the tribal records to outline the boundaries of the parcels and determine the interests of the allottees.

The negotiations between ADOT and the Community resulted in the Community's agreement to grant the easement for $207 million, which represented the fair market value of the land taken plus severance damages to unallotted tribal lands and allotment parcels. The amount was determined by the ADOT appraisals and approved by the United States, the Community, and the individual landowners. Petition for Special Action (Petition) at 4. Pursuant to the federal statutory and regulatory scheme outlined above, the treasurer deposited the $207 million as a lump sum into an escrow account at Security Pacific Bank (Security). Then, on July 17, 1990, the

United States executed the easement grant to ADOT. Grant of Easement for Right-of-Way, Petition Exh.F.

The easement provides that "the exact amount to be paid [from the lump sum total] to each landowner will be computed by the Bureau of Indian Affairs and the Salt River Pima–Maricopa Indian Community based on the interest ... held by each landowner and on the value of each ... parcel...." *Id.* However, as part of its contract with the Community, ADOT agreed to have its consultant prepare a computer program to calculate the dollar amounts owed to each allottee. Complaint for Special Action and Temporary Restraining Order (Complaint), Para. 5 (filed Aug. 17, 1990); Answer, Para. 5 (filed Sept. 4, 1990). This program was based on the confidential information already held by the consultant in connection with the earlier appraisals. Security then used the computer program to generate checks for the amount due to each individual allottee.

The actual payout of funds took place on July 17 and 18, 1990, immediately after the right-of-way easement was granted. Staff members of the Community distributed the checks at a location on the reservation with the assistance of ADOT. The Community asserts, and Phoenix Newspapers does not deny, that the checks were issued by Security, as escrow agent of the United States, and not by the treasurer. Petition at 4. The checks were thus distributed after the completion of the transaction, at a time when the funds were held by the United States on behalf of the Community, and not by the state of Arizona. The document at issue in this case is Security's computer printout of the name and address of each allottee, along with the amount paid to each. The information is not available in or from any office of the state. The computer printout is hereafter referred to as the "check distribution list" or the "list."

## C. The Disclosure Request of Phoenix Newspapers

On August 14, 1990, Kerry Fehr requested from ADOT under A.R.S. § 39–121.01 a list of the individual allottees and the amounts they received for their interests. On August 15, the Community made a written demand that ADOT return the ownership and payment records to the Community and honor its confidentiality agreement. In a letter dated August 16, ADOT denied Fehr's request, stating that "these records belong to the Indian Community." Complaint Exh.C. On August 17, ADOT returned all documents containing confidential information to the Community, in accordance with the written demand from the Community and ADOT's "previous commitments ... to preserve the confidentiality of the materials and the privacy of tribal members." Affidavit of Robert L. Langguth, Memorandum Exh.F. The documents returned to the Community consisted of

title reports for individual parcels of land prepared by the Bureau of Indian Affairs, computer printout sheets containing names of individual allottees and amounts received by the allottees, computer diskettes containing the allottees names and amounts received, computer printouts prepared by the escrow agent containing the names of allottees and payments made, receipts prepared by the escrow agent, the check register of the escrow agent and Xerox copies of checks issued by the escrow agent.

*Id.*

Also on August 17, Phoenix Newspapers filed a special action in superior court against the State of Arizona, ADOT, and Charles Miller, director of ADOT, seeking to compel disclosure of the allottees' names and amounts received. *See* A.R.S. § 39–121.02. Phoenix Newspapers also sought and obtained an order restraining ADOT from turning the documents over to the Community. The documents, however, had already been delivered to the Community.

On August 24, at a show cause hearing in superior court, ADOT's attorneys revealed that the treasurer had a copy of the check distribution list. Phoenix Newspapers requested disclosure of the list. Nothing in the record shows how the treasurer came into possession of the list, nor has the state offered any explanation. The Com-

munity's attorney sent a letter to the treasurer on August 29, formally requesting that the list be withheld from disclosure pending determination of its status in the superior court action. The state submitted the check distribution list, under seal, to the superior court judge on August 30, 1990. Additional documents from the right-of-way transaction, specifically copies of state treasury checks to an allottee who was inadvertently paid the incorrect amount and to an allottee who sold his interest after the transaction was completed, and supporting vouchers and memoranda, were submitted under seal on November 29, 1990.

At oral argument, Phoenix Newspapers maintained that the check distribution list was subject to disclosure under the public records law. The state argued that the allottees had protected privacy interests under federal law and the confidentiality agreement between the Community and ADOT. The Community declined to intervene at this time, believing its interests were being adequately protected by the state.

The superior court did not rule on the inherent applicability of the public records law, but found that the state had "failed to sustain its burden of proof that specific material harm will result from disclosure." The court therefore ordered disclosure to Phoenix Newspapers. Minute Entry, Nov. 14, 1990. On November 26, the state and Phoenix Newspapers stipulated to entry of judgment, reciting that the state had failed to prove that specific harm would result from disclosure of the documents and that the documents should be turned over to Phoenix Newspapers. The Community moved to intervene as a defendant the same day, asserting that the state was no longer protecting its interests. The motion to intervene was granted, but the judge ordered that the Community was bound by the stipulated facts agreed to by the state and Phoenix Newspapers and could not "relitigate any underlying issues." Minute Entry, Dec. 5, 1990. Judgment was en-

tered on December 5 but was stayed for thirty days to allow the Community time to seek appellate relief. *Id.*

The court of appeals declined jurisdiction of the Community's petition for relief, and the Community then filed a special action petition in this court.[2] After hearing oral argument on February 5, 1991, this court found that the two checks generated by the treasurer and the supporting vouchers and memoranda were public records or other matters of the state of Arizona and ordered that they be unsealed immediately. Order, Feb. 22, 1991. Security's check distribution list remained sealed pending further order of this court.

■ The superior court's judgment ordering disclosure contains no express finding as to whether the check distribution list is a public record or other matter, nor does it address the federal privacy rules surrounding the content of the list. In accordance with the language in some Arizona cases, the superior court may have assumed that the list was within the category of documents subject to disclosure under A.R.S. § 39–121.01 and dispensed with the initial determination of whether the list was a public record or other matter to reach the determination of whether its release would have a harmful effect on the duties of an official or agency. *See, e.g., Carlson v. Pima County,* 141 Ariz. 487, 490, 687 P.2d 1242, 1245 (1984); *Little v. Gilkinson,* 130 Ariz. 415, 416–17, 636 P.2d 663, 664–65 (Ct.App.1981); *Church of Scientology v. Phoenix Police Dep't,* 122 Ariz. 338, 339, 594 P.2d 1034, 1035 (Ct.App. 1979). That approach is improper when, as in this case, the facts raise a substantial question as to the threshold determination of whether the document is subject to the statute. We accepted jurisdiction, therefore, to determine whether the check distribution list is a "public record" or "other matter" of the state of Arizona within the meaning of A.R.S. § 39–121, and, if so, whether it is a confidential, private doc-

**2.** *In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Arizona* Rules of Procedure for Special Actions, 17B A.R.S.

ument and therefore exempt from disclosure under the Arizona statute.

## DISCUSSION

### A. The Nature of the Information Sought

At the outset, we must compare the exact nature of the information sought with that already available under the public records law. The only information at issue is the check distribution list containing the names and addresses of Community allottees and the amount of the check issued to each. Phoenix Newspapers seeks to monitor ADOT's activities and expenditure of public funds to ensure that the "public trust" was not "compromised" due to "special consideration given to specific Community members." Supplement to Complaint Exh.E

The Community does not dispute that Phoenix Newspapers may investigate whether *Arizona public funds* were properly expended. The Community points out, however, that whether fair compensation was offered by ADOT for each parcel in the right-of-way may already be determined through documents in the public record. The Arizona Attorney General sent Phoenix Newspapers

> a list of individual allotments which sets forth the ... location of the allotment, its size, the amount [of land] to be taken for the freeway, the price per square foot, the amount of severance damages, and the total price/value of the allotment land to be taken ... [and] right of way plans which show the location of the allotments with respect to the proposed freeway.

Attorney General's letter of Aug. 30, 1990, Memorandum Exh.I. Presumably, the appraisals supporting the amount paid on each parcel are on file as part of ADOT's records. The Community asserts no rights of confidentiality as to this information. In addition, Phoenix Newspapers has ready access to the records of the right-of-way

transaction between ADOT and the United States, including the contract between ADOT and the Community, and the easement grant from the United States.

From these documents, Phoenix Newspapers and, indeed, any member of the public should easily be able to determine the amount paid by ADOT on each allotment and whether the allotment was located within the area to be used for the freeway. The only information not available is the personal identity of each allottee and the monetary amount each individual received for his or her fractional interest. The Community claims this information is not subject to Arizona's public records law and is subject to disclosure solely under federal law.

### B. Is the Check Distribution List a Public Record or Other Matter of the State of Arizona?

Arizona's Public Records Law provides that:

> *Public records and other matters* in the office of any officer at all times during office hours shall be open to inspection by any person.

A.R.S. § 39–121 (emphasis added). The statute does not define "public records" or "other matters," but these terms have been defined by Arizona case law. The Arizona statute, adopted in 1901, was taken from a California provision. *Arizona Bd. of Regents v. Phoenix Newspapers*, 167 Ariz. 254, 257, 806 P.2d 348, 351 (1991). Consequently, cases arising under the California statute are helpful to the interpretation of our law.[3]

In most cases, the fine distinction between public records and other matters is not a point in controversy. Therefore, where the record may fall within either category, we "dispens[e] with an initial determination of whether a document is a 'public record' or an 'other matter' and mov[e] directly to a determination of

---

**3.** *Cf. Jackson v. Phoenixflight Prods.*, 145 Ariz. 242, 245, 700 P.2d 1342, 1345 (1985) (consulting Texas cases construing a garnishment statute where Arizona statute adopted from Texas statute); *Cottonwood Dev. v. Foothills Area Coali-* *tion*, 134 Ariz. 46, 49–50, 653 P.2d 694, 697–98 (1982) (consulting Oregon cases construing referendum statute where Arizona statute was adopted in part from Oregon statute).

whether or not the countervailing interests enunciated in *Mathews v. Pyle* . . . override the policy of disclosure." *Carlson,* 141 Ariz. at 490, 687 P.2d at 1245 (sheriff's offense report regarding an assault by one inmate on another was generated pursuant to his official statutory duty and was subject to disclosure); *see also Little,* 130 Ariz. at 416–17, 636 P.2d at 664–65. In this case, however, the first issue is whether the check distribution list is a public record or other matter of the state rather than a private federal-tribal record. We have found no case that presents analogous facts and therefore consider the arguments raised by looking to the statute and applicable legal principles to determine whether the list is subject to disclosure.

### 1. *Is the Check Distribution List a Public Record?*

■ Phoenix Newspapers asserts that because the state treasurer possessed the check distribution list, it qualifies as a public record. The relevant case law emphasizes that the mere fact that a writing is in the possession of a public officer or public agency does not make it a public record. *See, e.g., People v. Olson,* 232 Cal.App.2d 480, 486, 42 Cal.Rptr. 760, 764 (1965); *City Council of Santa Monica v. Superior Court,* 204 Cal.App.2d 68, 73, 21 Cal.Rptr. 896, 899 (1962). As the Iowa Supreme Court noted in *Linder v. Eckard:*

> Not every document which comes into the possession or custody of a public official is a public record. It is the nature and purpose of the document, not the place where it is kept, which determines its status.

261 Iowa 216, 152 N.W.2d 833, 835 (1967). This is also the rule under the federal Freedom of Information Act (FOIA). The federal courts have uniformly held that mere possession of a document by an agency does not make it an agency record for purposes of public access under the FOIA. *See, e.g., Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 157, 100 S.Ct. 960, 972, 63 L.Ed.2d 267 (1980); *Warth v. Department of Justice,* 595 F.2d 521, 522 (9th Cir.1979); *Goland v.*

*CIA,* 607 F.2d 339, 345–47 (D.C.Cir.1978). Thus, as the term has come to be defined, a public record must also have some relation to the official duties of the public officer that holds the record—in this case, the state treasurer.

The term "public record" comprehends three alternative definitions in American case law, all of which this court set forth in *Mathews v. Pyle,* 75 Ariz. 76, 78, 251 P.2d 893, 895 (1952). The term first refers to a record "made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference." *Id.* (citation omitted). The check distribution list does not qualify under this definition because it was not "made by a public officer in the pursuance of a duty." The list was made by Security, the escrow agent of the United States, in the pursuance of its private, contractual undertaking to pay the escrow funds to the allottees.

A public record is also one that is "required to be kept, or necessary to be kept in the discharge of a duty imposed by law or directed by law to serve as a memorial and evidence of something written, said or done." *Id.; see also Smith v. Paul,* 174 Cal.App.2d 744, 345 P.2d 546, 551 (1959); *Olson,* 232 Cal.App.2d at 486–87, 42 Cal. Rptr. at 764–65. The treasurer's duties are set forth at A.R.S. § 41–172, which provides in relevant part:

> A. The state treasurer shall:
>
> \* \* \* \* \* \*
>
> 6. Keep an account of all monies received and disbursed, and keep separate accounts of the different funds and appropriations of money.

The funds in question here were paid out of the Security escrow account and not out of the state treasury. The check distribution list is thus an accounting of *federal* escrow funds, not state funds. As our February 22 order sets forth, payments by the state treasurer as part of the right-of-way transaction are part of the public record, as are all supporting documents. However, so far as this record shows, the treasurer did not have a statutory duty to keep the check

distribution list, did not compile the list, did not use the list, and did not even consult it in performing his duties.

Finally, the term "public record" comprehends any "written record of transactions of a public officer in his office, which is a convenient and appropriate method of discharging his duties, and is kept by him as such, whether required by ... law or not...." *Mathews*, 75 Ariz. at 78, 251 P.2d at 895; *People v. Purcell*, 22 Cal. App.2d 126, 70 P.2d 706, 708 (1937); *MacEwan v. Holm*, 226 Or. 27, 359 P.2d 413, 419 (1961). Again, the check distribution list records a transaction between the United States, as trustee, and individual Indian allottees, as beneficiaries. The Secretary had the duty to pay the appropriate compensation to the allottees. Phoenix Newspapers does not assert that the treasurer had any duty to the allottees; thus, the list was neither relevant, convenient, nor appropriate to any discharge of the treasurer's duties. The list, we emphasize, is a record of a transaction between a private party, Security, and an Indian community that, as a separate sovereign entity, is largely outside the jurisdiction of Arizona's laws and court system. *See Tracy*, 168 Ariz. at 35–36, 810 P.2d at 1042–43.

We conclude that the check distribution list does not qualify as a public record held in the treasurer's official capacity. Therefore, we turn to a determination of whether the list is an other matter within the meaning of the statute.

2. *Is the Check Distribution List an Other Matter?*

■ Other matters subject to the public's right of access include "documents which are not required by law to be filed as public records, but which relate to matters essential to the general welfare of taxpayers, such for example as matters of taxation, revenue, and the proceedings for carrying out of governmental projects at public expense...." *Mathews*, 75 Ariz. at 79–80, 251 P.2d at 896 (quoting *Runyon v. Board of Prison Terms and Paroles*, 26 Cal.App.2d 183, 79 P.2d 101 (1938)). In *Mathews*, this court found that documents

generated by the Arizona Attorney General in conjunction with an investigation of the land commissioner's office constituted other matters held by the governor, who had received the documents in his official capacity. Similarly, in *Moorehead v. Arnold*, the court of appeals found that annexation petitions held by the city of Tucson were other matters. 130 Ariz. 503, 505, 637 P.2d 305, 307 (Ct.App.1981).

As the California Court of Appeal noted in *City Council of Santa Monica*, "[t]here is no precise formula by which it can be determined whether a writing is such 'other matter'; it depends in each instance upon the facts of the particular case." 204 Cal.App.2d at 75, 21 Cal.Rptr. at 901. Two factors are of particular importance: whether the document is held in the official capacity of the state officer; and, if so, whether the public has a legitimate interest in the document that outweighs any governmental promise of confidentiality that has been made. *See Mathews*, 75 Ariz. at 80–81, 251 P.2d at 895–96. The term "other matters," therefore, includes only *public* matters. As one commentator wrote with regard to the California statute upon which our law is based:

> the courts early developed a limitation to the term "other matters" that removed some writings found in public offices from the scope of the inspection statutes. In effect, section 1227 has been construed as referring to "other *public* matters." "Public" has been defined as "of, pertaining to, or affecting, the people at large or the community." The definition, therefore, does not include records that reveal only the private affairs of citizens.

Comment, *Inspection of Public Records Under California Law*, 50 CAL.L.REV. 79, 81–82 (1962) (footnote omitted, emphasis in original).

■ In this case, there is no evidence that the treasurer received the check distribution list in his official capacity. Because the Community failed to establish the manner in which the treasurer came into possession of a copy of the list, Phoenix Newspapers argues that we must assume the treasurer held the list in his official capaci-

ty. We are unable to make this assumption because no statute connects such a document with any state officer and because the facts of this case illustrate quite clearly that the treasurer did not compile the list, did not transact any business with the list, and did not record any official business in the list. Thus, while the facts do not establish how the treasurer came into possession of the document—whether it was accidentally left in his office or sent there by design—the facts do make it impossible to assume with any degree of probability that he held the document in his official capacity as a state officer. If anything, the facts require exactly the opposite inference.

Moreover, we are not convinced that Arizona citizens have a legitimate interest in knowing the identities of Indian allottees who were paid funds out of a federal escrow account when the policy of federal and tribal law is to keep such information confidential, the state has agreed to respect that confidentiality, and the information itself is not the property of the state or its citizens. Arizona's public record contains sufficient information to determine whether the state paid fair value for the land located in the freeway right-of-way. This is the extent of Arizona's public interest. If there was fraud in distributions between the Community and the allottees or between landowners *after* the state funds were transferred to the United States, this is a matter for federal and tribal authorities. Arizona has no control over a disbursement of tribal or federal funds to Indian beneficiaries. In short, under the accepted definition of the term, the facts here do not support a finding that the check distribution list is an other matter held in the treasurer's official capacity.

3. *The Effect of Expenditure of State Funds to Generate the Check Distribution List.*

■ Phoenix Newspapers claims, finally, that because ADOT paid its consultant to create the computer program used to determine the monetary amounts due the Indian landowners, the check distribution list is

subject to disclosure. The argument is that because state funds were expended to *assist* in the disbursement of funds, the public has an interest in all aspects of the disbursement. The Community admits that "[a]lthough the distribution of the ADOT payment to allotted landowners was a duty of the United States, ADOT contributed services to facilitate and hasten the process. Particularly, ADOT developed a computer program to calculate the amounts to be paid to each allotted landowner." Petition at 4.

As we noted in *Carlson*, the 1975 amendments to the public records law broadened the category of matters to which the public right of inspection applies. 141 Ariz. at 489, 687 P.2d at 1244. A.R.S. § 39–121.-01(B) requires *public officers* to "maintain all records reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and of any of their activities which are supported by funds from the state or any political subdivision thereof." *Id.* (citing § 39–121.01(B)). Thus, Phoenix Newspapers argues, the check distribution list must be disclosed because it is held by the treasurer to maintain an accurate knowledge of ADOT's expenditure of state funds. We find this argument unpersuasive. ADOT was required to pay fair value for the parcels within the freeway right-of-way. Fair value is a function of the size and location of the land parcels involved; the allottees' *names* were irrelevant to the determination. The list is neither a record maintained by a public officer nor a record of or pertaining to a public officer's activities. While records pertaining to the expenditure of state funds to purchase private property qualify as other matters, this does not mean that the seller's private records pertaining to his use of the funds paid by the state come within the public records law just because a copy inexplicably turns up in the hands of a public officer.

Nor do we believe that state funding for the private computer program put the program in the public domain. We have found no case under a state public records statute that addresses the effect of funding on the status of a record. We therefore turn for

guidance to federal cases that have considered the analogous issue under the FOIA. *See Church of Scientology,* 122 Ariz. at 340, 594 P.2d at 1036 (FOIA offers some guidance to Arizona courts in construing Arizona public records statute). In *Forsham v. Harris,* a private group of physicians and scientists developed data while conducting studies of diabetes treatment. 445 U.S. 169, 171, 100 S.Ct. 977, 980, 63 L.Ed.2d 293 (1980). The research was funded by a federal agency that also had authority to obtain the data. The data formed the basis of published reports that the Food and Drug Administration relied on in taking certain actions. The issue was whether federal funding in conjunction with the federal right of access rendered the data an agency record for purposes of the FOIA. The Supreme Court held that these facts were not sufficient to create an agency record because the federal agency did not "control" the documents. *Id.* at 182, 100 S.Ct. at 985; *see also Ciba–Geigy Corp. v. Mathews,* 428 F.Supp. 523, 532 (S.D.N.Y.1977) ("Because there has not been an adequate showing that the underlying [substantially federally-funded] data of the researchers was directly controlled or substantially utilized by a government agency in the performance of governmental operations, the records cannot be deemed 'agency records' for purposes of disclosure under the FOIA.").

■ Of course, *Forsham* and *Ciba–Geigy* were decided under the FOIA, not under the Arizona statute. However both the FOIA and our statute seek to make government agencies accountable to the public by giving the public a right of access to records concerning an agency's activities. Conversely, the public has no right of access to private records located in government offices that have no relation to the agency's activities. To the contrary, as the United States Supreme Court has commented:

> the FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed.

*United States Dep't of Justice v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 774, 109 S.Ct. 1468, 1482, 103 L.Ed.2d 774 (1989); *cf. Industrial Comm'n v. Holohan,* 97 Ariz. 122, 126, 397 P.2d 624, 627 (1964) (information in Commission's file that is not "collected to serve as a memorial of an official transaction or for the dissemination of information is private ... [and] is protected from the prying of unauthorized individuals to the same extent as the records of a private person").

The above cases establish that the public does not have a right to demand access unless the record has a substantial nexus to the agency's activities. We must therefore determine whether there is a nexus between the treasurer's office and the check distribution list.

4. *Is Possession a Nexus Between the Treasurer's Office and the Check Distribution List?*

■ The federal courts have uniformly held that an agency must control a record before it is subject to disclosure under the FOIA. *See, e.g., United States Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 145–46, 109 S.Ct. 2841, 2847–48, 106 L.Ed.2d 112 (1989); *Kissinger,* 445 U.S. at 151–52, 100 S.Ct. at 969; *Wolfe v. Department of Health & Human Servs.,* 711 F.2d 1077, 1079–80 (D.C.Cir.1983); *National Sec. Archive v. Executive Office of the President,* 688 F.Supp. 29, 32 (D.D.C.1988), *aff'd,* 909 F.2d 541 (D.C.Cir.1990) (agency to whom FOIA request is directed must generally have exclusive control of the disputed documents). When one agency transfers the document to another, the receiving agency must also exert control over the document before disclosure can be compelled. *See Ciba–Geigy,* 428 F.Supp. at 532 ("analysis of control remains the critical inquiry when there has been a transfer of the records in question."). The control test is helpful in analyzing our statute, which also exempts private information from disclosure even when it is held by a government agency.

■ An agency has control over the documents when they "have come into the agency's possession in the legitimate con-

duct of its official duties." *Tax Analysts,* 492 U.S. at 145, 109 S.Ct. at 2848. Thus, mere physical possession is not sufficient to impart control. *Kissinger,* 445 U.S. at 151, 100 S.Ct. at 969. In *Kissinger,* the Court considered whether certain notes of Kissinger's private telephone conversations, which were taken to his office at the State Department, were agency records by virtue of the fact that they were located in the offices of a government agency. The Court concluded:

> We simply decline to hold that the physical location of the notes of telephone conversations renders them "agency records." The papers were not in the control of the State Department at any time. They were not generated in the State Department. They never entered the State Department's files and they were not used by the Department for any purpose. If mere physical location of papers and materials could confer status as an "agency record" Kissinger's personal books, speeches, and all other memorabilia stored in his office would have been agency records subject to disclosure under the FOIA.

445 U.S. at 157, 100 S.Ct. at 972 (citing *Forsham,* 445 U.S. 169, 100 S.Ct. 977).

In *Kissinger,* the Court found that the agency did not have the requisite control because it neither generated the document nor used the document for an agency purpose. *Id.; see also Tax Analysts v. United States Dep't of Justice,* 845 F.2d 1060, 1068 (D.C.Cir.1988), *aff'd,* 492 U.S. 136, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989) ("Agencies must use or rely on the document to perform business, and integrate it into their files, before it may be deemed an 'agency record.'"). As we have noted above, the record in this case does not show that the treasurer generated the list or used it in the course of his official duties. An agency's mere possession of private information does not make that information subject to disclosure under A.R.S. § 39–121.

## CONCLUSION

■ The determination of whether the check distribution list is within the class of records subject to disclosure does not depend upon its physical location in the trea-surer's office or the fact that the computer program used in generating the list was developed with state funds. The issue is whether the treasurer generated or used the list in a capacity related to the duties of that office. The record does not support such a finding. To the contrary, the list was generated by Security, the escrow officer, in the scope of its duty to the Community and the United States to disburse the appropriate amounts of the lump sum payment to individual Indian allottees.

The list memorializes a transaction between the United States, as trustee, and the individual allottees, as beneficiaries. Absent evidence that the treasurer used the list to effectuate any of the duties of state government, or holds the list to memorialize those duties, we cannot find that the list is a public record or other matter of the state of Arizona. We recognize that in any case where a significant amount of state funding has contributed to a public works project, the press may have an important interest in probing the details of the transaction. However, to the extent that the information sought is owned and controlled by another government, the press must apply to that entity, under its laws, for disclosure.

Because we conclude that the check distribution list is not a public record or other matter, we do not reach the issue of whether disclosure is barred by "countervailing interests of confidentiality, privacy or the best interests of the state...." *Carlson,* 141 Ariz. at 491, 687 P.2d at 1246; *Board of Regents,* 167 Ariz. at 257, 806 P.2d at 351. Thus, we need not determine whether the list was protected from disclosure by the confidentiality agreement between ADOT and the Community.

We vacate the superior court's order requiring disclosure and order that the check distribution list be returned to the Community.

GORDON, C.J., and CAMERON, MOELLER and CORCORAN, JJ., concur.