The **DENVER PUBLISHING COMPANY**
d/b/a Rocky Mountain News,
Petitioner,

v.

The **BOARD OF COUNTY COMMISSION-ERS OF the COUNTY OF ARAPAHOE,** Colorado; Tracy Baker, Clerk & Recorder, Arapahoe County; and Leesa Sale, Assistant Deputy Clerk, Respondents.

No. 03SC783.

Supreme Court of Colorado,
En Banc.

Sept. 12, 2005.

Baker & Hostetler, LLP, Marc D. Flink, Casie D. Collignon, Denver, for the Petitioner.

Kathryn L. Schroeder, Arapahoe County Attorney, Ronald A. Carl, Deputy County Attorney, Littleton, for the Respondent Board of County Commissioners of Arapahoe County.

Hall & Evans, Thomas Lyons, Harry Souvall, Denver, Amicus Curiae for the Colorado Counties, Inc.

King & Greisen, LLP, Julie C. Tolleson, American Civil Liberties Union of Colorado, Mark Silverstein, Legal Director, Denver, Amicus Curiae for the American Civil Liberties Union of Colorado.

Faegre & Benson LLP, Thomas B. Kelley, Steven D. Zansberg, Denver, Amicus Curiae for the Colorado Press Association and Colorado Freedom of Information Council.

MARTINEZ, Justice.

Petitioner, Denver Publishing Company (DPC), appeals a court of appeals' decision reversing an order of the district court and stopping the public release of several e-mail messages maintained by Arapahoe County. *See In re Bd. of County Comm'rs,* 95 P.3d 593 (Colo.App.2003). The court of appeals found that although all of the e-mail messages between an elected official, Tracy Baker, and a public employee, Leesa Sale, were public records subject to the disclosure provisions of the Colorado Open Records Act (CORA), there exists a constitutional privacy exception to the statute that was not properly considered by the trial court. Accordingly, the court of appeals remanded the case to the district court to determine which messages, if any, fell within the constitutional privacy exception to the statute and should be protected from disclosure.

We begin our analysis by looking to the definition of "public records" set forth in CORA and by considering this successful 1968 Act in light of earlier failed legislation. We find that the General Assembly has not defined "public records" to include all records that a public agency made, maintained, or kept. Instead, only those records that a public agency made, maintained, or kept for use in exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds are "public records." Further, when the General Assembly amended CORA in

1996, and added e-mail and the correspondence of elected officials to the definition of "public records", the General Assembly maintained the requirement that records made, maintained, or kept by a public agency have a demonstrable connection to the exercise of functions required or involved in the receipt or expenditure of public funds. In addition, the General Assembly also specifically provided that acceptance of compensation or use of funds or equipment in creating, receiving, or maintaining the e-mail does not convert a record that is not a public record into a public record as defined by CORA. We conclude that the General Assembly has provided that the content of a public official's e-mail message must be examined to determine whether the e-mail addresses public functions or the receipt or expenditure of public funds to decide whether the e-mail is a "public record."

Thus, we determine that the express provisions of CORA, namely the definition of "public records" set forth in section 24–72–202(6)(a), C.R.S. (2004), protect the privacy interests at issue in this case and therefore the court of appeals unnecessarily reached the constitutional analysis of the e-mail messages. In applying the definition of "public records", we conclude that many of the e-mail messages at issue are not, in fact, public records within the scope of CORA. Because the court of appeals and district court concluded that all the e-mail messages at issue were public records, we remand the case for findings consistent with this opinion.

## I. Facts and Procedure

In 2002, the Board of County Commissioners of Arapahoe County ("the Board") initiated an investigation of the Arapahoe County Clerk and Recorder's Office upon allegations of constructive discharge, sexual harassment/hostile work environment, violations of open meetings laws, violations of the Campaign Practice Act, and misuse of County property and funds. The investigation focused on County Clerk and Recorder, Baker, as well as the Assistant Chief Deputy Clerk of Arapahoe County, Sale, who were said to be involved in an extra-marital sexual relationship.

The end product of the investigation was an extensive report ("the report") created by a private investigator hired by the County that set forth his findings. The report contained one binder made up of several subreports and supporting documentation. As part of the report and supporting documentation, the investigator identified, among other things, 622 e-mail messages authored by Baker, or authored by Sale and sent to Baker, that were sent using the County's e-mail and text-pager systems.[1] Of these messages, 570 contained sexually explicit and/or romantic content sent between Baker and Sale. Although the Board subsequently released the report to the public in October 2002, it was redacted and did not contain the contents of the sexually explicit messages or the subreport titled "Sexual Harassment/Hostile Environment".

Following the release of the redacted report, the Board received several written requests from media outlets, including DPC, that a non-redacted copy of the report be released and "all of the e-mail messages, instant messages or other electronic communications sent or received by Baker" for a 33–month period be disclosed pursuant to the provisions of CORA.

The Board did not disclose a non-redacted version of the report or the messages upon request, but instead filed a petition in the district court pursuant to section 24–72–204(6)(a), C.R.S. (2004), of CORA for a judicial determination whether the requested

1. The messages were sent over the County's "Metrocall" text pager system. This system allowed employees to enter text messages into a computer terminal and send the message to a text-capable pager. Although this type of messaging system does not fit into the traditional notion of computer-to-computer e-mail, we refer to the text messages as "e-mail" or simply "messages" for sake of convenience and consistency with the statutory language in CORA. *See* § 24–202(1.2), C.R.S. (2004) (" 'Electronic mail' means an electronic message that is transmitted between two or more computers or electronic terminals, whether or not the message is converted to hard copy format after receipt and whether or not the message is viewed upon transmission or stored for later retrieval. 'Electronic mail' includes electronic messages that are transmitted through a local, regional, or global computer network.").

items could be released. The Board asserted that there was a strong public interest in the disclosure of information relevant to alleged official misconduct, but wanted to ensure that the rights of all parties were protected. The Board specifically sought a court determination whether disclosure of the non-redacted report was prohibited by section 24–72–204 or whether disclosure was prohibited or restricted by the constitutional right to privacy. DPC intervened in the action contending that the report and e-mail messages were public records pursuant to CORA and the custodian of records had no statutory basis for objecting to the release of such public records.

As interested parties, Baker and Sale contested the disclosure of the e-mail messages as part of the released report as well as any separate release of the e-mail messages. To support their argument against the release of the messages, Baker and Sale asserted three arguments. First, they argued that the messages were not "public records" as provided in section 24–72–202 and therefore did not fall within the mandatory disclosure provisions of CORA. Second, even if the messages were "public records" as defined by CORA, the messages fell within several of the statutorily enumerated exceptions to CORA and were therefore exempt from disclosure and, in some cases, prohibited from disclosure altogether. Last, even if the express provisions mandated or permitted disclosure, Baker and Sale argued that state and federal constitutional privacy rights protected the messages from disclosure to the public.

After a hearing on the petition, the district court entered its ruling finding that the messages were public records within the scope of CORA and not subject to any express or implied exemptions. The court also found that Baker and Sale did not maintain any expectation of privacy in the messages and therefore the messages were not constitutionally protected from disclosure. Accordingly, the district court ordered the redacted portion of the report released, including all of the e-mail messages therein.

Baker and Sale appealed, setting forth the same arguments as raised before the district court. The court of appeals agreed with Baker and Sale, in part, and reversed the order of the district court. *See In re Bd. of County Comm'rs*, 95 P.3d at 604. In doing so, the court of appeals reached, *inter alia*, four legal conclusions regarding the operation of CORA and its function in relation to an individual's right to privacy.

First, the court of appeals found that all of the messages at issue, regardless of their content, were public records subject to the provisions of CORA because the messages were "writings" as defined by section 24–72–202(7), C.R.S. (2004), and were maintained by the county. *Id.* at 597. Second, the court of appeals found that the messages did not "fall within the exception" for correspondence of an elected official as described by section 24–72–202(6)(a)(II)(B) because the messages involved the expenditure of public funds. *Id.* at 597–98. Third, the court found that the subreport on "Sexual Harassment/Hostile Environment" as well as any messages identifying the complaining employee were precluded from disclosure pursuant to section 24–72–204(3)(a)(X)(A) because the report was a record of sexual harassment complaints and investigations and CORA protected the identity of the employees involved. *See id.* at 598–99. Fourth, the court of appeals found that although the sexually explicit e-mails unrelated to county business were public records that fell within the scope of CORA, some of the messages were nevertheless exempt from disclosure because they were protected by the constitutional right to privacy. *Id.* at 599–604. The court of appeals found that the factors set forth in *Martinelli v. Dist. Court*, 199 Colo. 163, 612 P.2d 1083 (1980), to determine if documents fell within the scope of constitutional privacy were relevant to the analysis of the e-mail messages at issue here and remanded the case to the district court with directions to determine which of the messages were constitutionally protected and which should be disclosed under CORA. *Id.* at 604.

We granted certiorari to determine whether the mandated disclosure of the e-mails pursuant to CORA is barred by Baker's and Sale's constitutional privacy rights.[2]

---

2. We granted certiorari on two issues:

1. Whether the court of appeals erred by find-

## II. Discussion

The constitutional privacy issue in this case arises in a dispute surrounding the reach of CORA and the statutorily-mandated disclosure of e-mail messages exchanged between Baker and Sale, whom Baker directly supervised. At issue are competing public policies-open access to government records and the protection of individual privacy. Because the court of appeals interpreted the provisions of CORA and found a constitutional privacy exemption to CORA's mandatory disclosure provisions, DPC asks us to review this interpretation and find that no such constitutional exemption exists.[3]

Central to DPC's argument is that when the General Assembly adopted CORA and its provisions dealing with e-mail messages, the General Assembly recognized and balanced individual privacy concerns by the express terms of the statute. DPC points to the General Assembly's legislative declaration acknowledging that the "act is intended to balance the privacy interests and practical limitations of public officials and employees with the public policy interests in access to government information." *See* ch. 271, sec. 1, 1996 Colo. Sess. Laws 1479, 1479. DPC contends that the General Assembly balanced constitutional privacy interests by expressly excluding certain types of records from disclosure and, as such, the court of appeals erred when it found a "constitutionally based [sic] general privacy exemption" to the disclosure provisions of CORA.

Based on DPC's contention that the express provisions of CORA sufficiently balance and protect the individual privacy interests at issue in this case, we are compelled to first explore the provisions of CORA and the privacy protection already integrated into CORA's express statutory provisions. Furthermore, it is our obligation and crucial to our exercise of judicial authority that we do not resolve constitutional questions or make determinations regarding the extent of constitutional rights unless such a determination is essential and the necessity for such a decision is clear and inescapable. *See, e.g., People v. Lybarger,* 700 P.2d 910, 915 (Colo. 1985). Thus, although the constitutional right to privacy may bar access to public records otherwise disclosable under CORA, *see Wick Communications Co. v. Montrose Bd. of County Comm'rs,* 81 P.3d 360, 365 n. 4. (Colo.2003), before we proceed to any constitutional analysis we must first review the court of appeals' interpretation and application of CORA for a resolution originating in the express provisions of CORA.[4]

ing that certain e-mails subject to [CORA] were nonetheless exempt from disclosure because of the constitutional privacy rights of the government employees who generated the e-mails. 2. Whether the court of appeals erred when it held that certain public record e-mails were exempt from disclosure, when the records' custodian did not assert that disclosure would cause a substantial injury to the public interest and the sole parties objecting to disclosure were the government officials who generated the e-mails.

3. Although no party brought it to our attention, we are not unaware that a large portion of the sexually-explicit e-mail messages at issue here have been published on various websites. We do not believe the release of these messages ends our duty to analyze the issues in this opinion.

4. We are also compelled to explore this issue given the procedural stance the case has taken on appeal before this Court. Baker and Sale contested the designation of the e-mail messages as "public records" when the case was before the district court and the court of appeals. Since the issuance of the court of appeals' opinion and release of several e-mail messages to the media, Baker was recalled in a special recall election held in February 2004. Likewise, Sale no longer maintains her position as Assistant Chief Deputy Clerk with the County. When the case was subsequently appealed to this Court, neither Sale or Baker appeared to oppose the Petitioner's Petition for Writ of Certiorari and, once the Writ was granted, did not file briefs to contest the issues before the court. As a result, the briefs filed by DPC, the Board, and Amicus Briefs on behalf of the Colorado Counties, Inc. and the Colorado Press Association and Colorado Freedom of Information Council all advocated for reversal of the court of appeals' decision and favor the release of the messages as "public records" within the scope of CORA.

Upon invitation by the Court for Amicus Briefs, the American Civil Liberties Union (ACLU) filed an Amicus Brief to address the risks posed if the Court were to adopt the position taken by DPC, the Board, and the other amicus curiae parties. Although in its brief the ACLU did not take a position on which messages should be disclosed as "public records", during oral argument the ACLU supported the position taken in the court below by Baker and Sale that many

Accordingly, we begin our analysis where all CORA analysis begins-determining if the records at issue are public records within the scope of CORA's mandatory disclosure provisions. In doing so, when construing the statutory language of CORA, we "undertake de novo review and look first to the plain language, always striving to give effect to the General Assembly's intent and chosen legislative scheme." *Sooper Credit Union v. Sholar Group Architects, P.C.,* 113 P.3d 768, 771 (Colo.2005). "We interpret every word, rendering none superfluous; undefined words and phrases are read in context and construed literally according to common usage." *Id.*

## A. "Public records" under CORA

The General Assembly has declared that it is the "public policy of the state that all public records shall be open for inspection by any person at reasonable times, except as provided herein or as otherwise specifically provided by law." *See* § 24–72–201, C.R.S. (2004). In furtherance of this policy, the General Assembly enacted CORA, which requires the custodian of records to make available to the public all public records, subject only to certain exceptions. *See* ch. 66, sec. 3, 1968 Colo. Sess. Laws 201, 202 (currently codified as amended at 24–72–203(1)(a), C.R.S. (2004)). Critical to the function of CORA is the determination of what is and what is not a "public record".

CORA specifically defines "public records" as "all writings made, maintained, or kept by the state, any agency, institution, ... or political subdivision of the state ... for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." § 24–72–202. Public records under CORA also "includes the correspondence of elected officials" insofar as the correspondence is "demonstrab[ly] connect[ed] to the exercise of functions required or authorized by law or administrative rule" or involves "the receipt or expenditure of public funds." *See* § 24–72–202(6)(a)(II)(B).

We have addressed very few cases interpreting the extent of the "public records" definition and have never addressed the applicability of the definition to e-mail messages exchanged between an elected official and a public employee. We have, however, recently addressed the privacy implications of the definition and the distinction between private and public documents made by public officials.

In *Wick,* 81 P.3d at 364–66, we discussed the individual privacy protection inherent in CORA and the effect of such protection on the reach of CORA as a whole. As we explained, "[a]lthough generally CORA favors broad disclosure, the General Assembly [in adopting its provisions] recognized that not all documents should be subject to public disclosure." *Id.* at 364. As such, the General Assembly placed two limits in CORA to protect privacy interests. *Id.* First, the General Assembly provided a "limited" definition of "public records". *Id.* Second, for certain types or classes of records that met the definition of "public records", the General Assembly provided specific exceptions that prohibited disclosure by the custodian of the records. *Id.* In focusing on this first limitation, we concluded that "CORA was not intended to cover information held by a government official in his private capacity." *Id.*

At issue in *Wick* was whether a public official's private diary that he relied on in preparing an official report was a public record. *Id.* at 361. In addressing this issue, we focused on the first part of the public record definition-whether a "writing" is "made, maintained or kept" by the state or a political subdivision of the state. We found that "[a] diary is the foremost example of one's private papers," and simply because a document was "made during one's tenure as a public official does not render it a public record." *Id.* at 365. Furthermore, we took notice that CORA and our prior case law "steadfastly

of the messages are not "public records" as defined in CORA. Thus, because the "public record" designation has been fully litigated and briefed below, the issue was raised in oral argument, the issue was fully briefed before us in the

context of the constitutional arguments, and the issue is preliminary to a constitutional analysis, we are compelled to review this finding of the court of appeals before proceeding to the constitutional arguments presented by the parties.

guard against disclosure of private papers" and concluded that the purpose behind CORA was not furthered by "disclosing public officials' every thought and feeling [to the public]." *Id.* As such, we concluded that the public official's diary was not a public record and therefore did not fall within the mandatory disclosure provisions of CORA. *See id.* at 366.

As in *Wick*, we are again concerned here with the incorporation of privacy and the interpretation and application of the "public records" definition. Unlike *Wick*, however, where the diary was not "made, maintained, or kept" by the County, the e-mail messages here are "maintained or kept" by Arapahoe County. Instead, the issue of whether the e-mails sent and received by Baker are "public records" turns on whether the reason the records were "maintained or kept" was "for use in the exercise of functions required or authorized by law or administrative rule or involve[d] the receipt or expenditure of public funds."

Because the records at issue are e-mail messages, we turn to the history of CORA to understand the intent of the General Assembly when it expanded CORA's coverage to e-mail messages. In doing so, we turn first to the privacy considerations that guided the General Assembly to originally adopt the "public records" definition as part of CORA in 1968. We then look to the 1996 amendments to CORA and the privacy interests the General Assembly took into account when it incorporated e-mail messages and the correspondence of elected officials as "public records". Based upon this review, we conclude that the scope of CORA's "public records" definition-the part of that definition stating "the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds" in particular-limits the type of e-mail messages covered by CORA and specifically distinguishes between those messages that relate to the performance of public functions or the receipt and expenditure of public funds and those that do not.

### 1. The 1968 Act

In the 1960s, with the expansion of government, momentum grew for the concept that "[p]ublic business is the public's business." Legislative Council of the Colo. Gen. Assembly, *Open Public Records for Colorado* 1–2 (Research Publ'n No. 126, 1967) (hereinafter *"Public Records Report"*) (quoting Harold L. Cross, *The People's Right to Know: Legal Access to Public Records and Proceedings* xiii (New York: Columbia Univ. Press 1953)). As such, in the years prior to 1968, the General Assembly sought to provide open government and public access to certain government records by attempting to adopt open records legislation, though they did so without success. *Id.* at 15.

Following the failure of a proposed open records act in 1967, the General Assembly authorized the Colorado Legislative Counsel to form a committee to study the shortfalls of the failed open records legislation and draft new legislation "to determine those records of our state and local governments that should be open to public review and those that should have only limited access to such review or should be maintained solely for review by governmental officials in the course of their assigned duties." *Id.* at 15; *see also* Sen. Joint Res. No. 42, 1967 Colo. Sess. Laws 1094, 1094. As described by the committee's chairman, the study was an attempt to best resolve "which classes of records should be made available to the public and which should be maintained as private or confidential." *Id.* at iii.

The study resulted in the *Public Records Report* discussing the several concerns with prior legislation and the difficulty with balancing two significantly competing interests-freedom of press through open government and individual privacy. *Id.* at 2. In acknowledging these competing interests, the report identified the need for a "responsible legislature" to strike a balance between these two policy considerations and "arrive at an agreement as to what constitutes a proper balance." *Id.* Thus, the report set forth proposed legislation that purported to strike such a balance.

The proposed legislation declared the driving policy of the open records legislation was to require that "all public records shall be open for inspection." *Id.* at xix. The report

pointed out that with such a broad underlying policy, the definition of "public records" was "especially important" given that it "determines the reach of the bill." *Id.* at xiii. That is, if a record falls within the scope of the "public records" definition, it must be disclosed or be made open to inspection unless the statute otherwise excludes it. If a record does not fall within the definition of public record, the statute does not require or prohibit disclosure to the public.

Given the significance placed upon the "public records" definition, one significant change from the failed legislation and the legislation proposed by the Legislative Counsel was how "public records" were defined. For example, the failed 1967 open records act defined "public records" very broadly by incorporating nearly every aspect of records kept by government and public employees, including all written documents that were made, produced, executed, received, or preserved "in pursuance of law" or "in connection with the transaction of public business." [5] Although the definition proposed in the report included all written materials, it narrowed the class of written documents to those "made, maintained, or kept . . . *for use in* the exercise of function required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." *Id.* at xix (emphasis added). This

proposed definition was intended to protect individual privacy and narrow the focus of the open records act to those records directly related to functions of government. By qualifying the class of written records held by the government, the legislation ensured that the "public records" definition would not be all-inclusive, and instead would require a content-driven inquiry ensuring the records disclosed under CORA were tied to public functions or public funds. As such, the proposed definition alleviated significant concerns that the broad 1967 definition gave "almost unlimited access to records at the state and local levels." *Id.* at 16.

Following the Legislative Counsel's recommendation to adopt the proposed legislation, the General Assembly in 1968 adopted the definition of "public records" and the remainder of the proposed legislation nearly verbatim as Colorado's first comprehensive open records law.[6] *See* Ch. 66, secs. 2–6, 1968 Colo. Sess. Laws 201, 201–04 (currently codified as amended at sections 24–72–201 to –206, C.R.S. (2004)). With minor changes not relevant here, CORA still makes use of this same definition.[7]

### 2. The 1996 Amendments

At the time CORA was originally adopted, e-mail and digital-text messages had not

---

**5.** The 1967 failed legislation defined "public records" as:

"Public records" means all books, papers, maps, photographs, or other official documentary materials, regardless of physical form or characteristics, made, produced, executed, or received by any office, officer, agency, or institution of this state, or by any office or officer of any political subdivision of the state, in pursuance of law or in connection with the transaction of public business, and preserved or appropriate for preservation of that office, officer, agency, or institution, or its successor, as evidence of the organization, function, policies, decisions, procedures, operations, or other activities of the state, or political subdivision, because of the information contained therein. Such term does not include library and museum material made or acquired and preserved only for convenience of reference, or stocks of publications and processed documents."

*See Public Records Report* at 123 (Appendix D, Proposed S.B. 67–217, *Bill for An Act Providing For Access to Public Records and for Photographing of Such Records).*

**6.** Only minor changes were made to the proposed legislation to include that any "person in interest" was not prohibited from accessing records. *See* Ch. 66, secs. 2–5, 1968 Colo. Sess. Laws 201, 201–04. The proposed legislation also included the Legislative Counsel's recommendation to adopt several exceptions to this definition to identify specific types of records that, although the records fell within the "public records" definition, should not be not open to public inspection. *See id.*

**7.** Section 24–72–202(6)(a)(I) of CORA currently defines "public records" as:

all writings made, maintained, or kept by the state, any agency, institution, a nonprofit corporation incorporated pursuant to section 23–5–121(2), C.R.S., or political subdivision of the state, or that are described in section 29–1–902, C.R.S., and held by any local government-financed entity for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds.

been developed and were not used by the State of Colorado or its political subdivisions. However, in the 1990's, as the technology grew and rapidly became a common tool of communication and data storage to conduct the State's business, the General Assembly sought to clarify how and when e-mail and other digital records would fall within the mandatory disclosure provision of CORA. *See* ch. 271, sec. 1, 1996 Colo. Sess. Laws 1479, 1479 (setting forth the legislative declaration with regard to the use of e-mail under CORA).

The General Assembly understood that the use of e-mail presented a complex issue given the unique properties of e-mail messaging. *See id.* As the General Assembly described it, "the use of electronic mail by agencies, officials, and employees of state government creates unique circumstances" given that e-mail shares the private characteristics of telephonic communication and, at the same time, it "creates an electronic record that may be used or retrieved in electronic or paper format." *Id.* Like the use of telephones, by 1996 e-mail served a significant role in day-to-day business matters. Similarly, as with the occasional use of the telephone, e-mail was becoming a common tool of communicating outside business matters. For example, e-mail gave employees and employers the ability to take care of personal and family matters quickly and efficiently without having to leave the office. Much like the use of the telephone, this limited personal use served the best interests of business and government by keeping employees and employers in the office without significantly interrupting the workday. Taking these competing roles into consideration, the General Assembly in 1996 enacted legislation ("1996 amendments") expressly incorporating e-mail messages into CORA. *See id.* at secs. 2–8. The 1996 amendments brought e-mail within the scope of CORA's disclosure requirements in two ways.

First, the General Assembly added "electronic mail" to the definition of "writings" covered by CORA.[8] *See* § 24–72–202(7). As such, given that the definition of "public records" incorporated by reference "all writings," e-mail became one class of writings that may be deemed "public records". To be a "public record", however, like other writings, e-mail must also be made, maintained, or kept by the government for use in exercise of functions required or authorized by law or administrative rule or involve the receipt or expenditure of public funds.

Second, the General Assembly added e-mail correspondence sent to and from elected officials as a public record. Prior to the 1996 amendment, it was unclear to what extent any correspondence of elected officials was considered a "public record". Through the amendment, the General Assembly identified three types of communications that may be deemed "public records"—communications sent by U.S. mail, private courier, and e-mail. § 24–72–202(1). The General Assembly, however, in an effort to protect privacy interests, required that for a communication to be a "public record", such communications could not be "work product" or "confidential communications" from constituents. *See* §§ 24–72–202(6)(a)(II)(A) & (C). In addition, like all records that fall within the definition of "public records", elected officials' correspondence must have a "demonstrable connection to the exercise of functions required or authorized by law or administrative rule" or "involve the expenditure of public funds." *See* § 24–72–202(6)(a)(II)(B).

The General Assembly also included a third provision with the 1996 amendments that, although not limited to e-mail, affects the factors considered in determining whether or not a record is a public record. Section 24–72–202(6)(a)(III) provides that "acceptance by a public official or employee of compensation for services rendered, or the use by such official or employee of publicly-owned equipment or supplies, shall not be construed to convert a writing that is not otherwise a 'public record' into a 'public record'." In other words, just because a person is employed in the public sector and may use

---

**8.** Section 24–72–202(7) defines "writings" as "all books, papers, maps, photographs, cards, tapes, recordings, or other documentary materials, regardless of physical form or characteristics. 'Writings' includes digitally stored data, including without limitation electronic mail messages, but does not include computer software."

publicly-funded resources to send a message does not, separate and alone from other considerations, make the message a public record.

## B. Analysis

Given the plain language of these amendments and their incorporation into the CORA statutory scheme as a whole, it is apparent that e-mail must meet the same requirements as any other record to be deemed a "public record". To be a "public record", an e-mail message must be for use in the performance of public functions or involve the receipt and expenditure of public funds. The simple possession, creation, or receipt of an e-mail record by a public official or employee is not dispositive as to whether the record is a "public record". The fact that a public employee or public official sent or received a message while compensated by public funds or using publicly-owned computer equipment is insufficient to make the message a "public record".

The inquiry here must be content-driven. In *Wick*, to decide whether the court may examine the contents of a personal diary, we addressed the threshold question of who has the burden of proving that CORA applied. 81 P.3d at 362–63. To resolve this question, we focused on whether the diary at issue was "made, maintained, or kept" by a public official such that the dairy was likely a "public record" under CORA. *Id.* at 366. We concluded that such a preliminary determination could be made without looking to the content of the diary and instead focused on the context in which it was created and the capacity in which the diary was kept. *Id.* If it was written or maintained in a private capacity, it remained outside the scope of the public records definition; if it was written or maintained in a public capacity, it was likely within the scope of the definition. *Id.* The inquiry into whether records are "public records", however, does not end here. Instead, because there exist certain records that may be "made, maintained, or kept" by a public agency or official that are not "for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds," we

must take a closer look at the records at issue. This is equally true where the records at issue are e-mail messages generated by public officials and public employees.

Consistent with *Wick*, when a party requests records under CORA, the initial burden is on the requesting party to demonstrate that the records at issue are likely "public records." *Id.* at 362. Under circumstances where the records are in the possession of a public official, rather than an agency, that burden may be met if it can be shown that the records are "made, maintained, or kept" in a public capacity. *Id.* at 366. Where the agency is the custodian of the records sought and the records are "made, maintained, or kept" in a public capacity, the burden to show that the records are likely public records has been met. The burden then shifts to the public agency to show that the records are public or nonpublic. To determine whether the records kept by the agency are public or non-public records, the agency must look to the content of the records to resolve whether they relate to the performance of public functions or involve the receipt or expenditure of public funds.

Here, the messages were "maintained or kept" by Arapahoe County. As such, a closer inquiry into the content of the message is required to determine if the messages were "for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds." The content of the messages must address the performance of public functions or the receipt and expenditure of public funds. Insofar as the messages do not, they remain non-public and outside the scope of CORA.

The content-driven inquiry is not made inapplicable to the correspondence of elected officials by the requirement of section 24–72–202(6)(a)(II)(B) that elected officials' correspondence be "demonstrably connected" to an elected official's duties as an elected official or the receipt or expenditure of public funds. Rather, this requirement also mandates that one look to the content of the message to determine if it addresses the

performance of public functions or the receipt or expenditure of public funds.

Were it correct, as DPC argued in its briefs before the district court and the court of appeals,[9] that a message authored or received by an elected official is enough to deem a message a "public record", it would not have been necessary for the General Assembly to add language requiring a "demonstrable connection" to the duties of the elected official or public funds. Had that been the case, the General Assembly could have simply declared that all e-mail correspondence to and from an elected official was a "public record" within the scope of CORA. Because the General Assembly instead required a "demonstrable connection" to the "exercise of functions required or authorized by law or administrative rule" or "involv[ing] the receipt or expenditure of public funds," the content of the message is the only way to determine if such a connection exists.

Furthermore, it is also clear that section 24–72–202(6)(a)(II)(B) was not intended to create a backdoor to acquire personal or private communications sent to or from an elected official by demonstrating a tenuous or indistinct impact or effect on an elected official's performance (or non-performance) of his official duties. The inclusion of an elected official's correspondence, namely the official's e-mail messages, into CORA was in furtherance of the concept that *"public business is the public's business." Public Records Report* at 1–2 (emphasis added). This inclusion did not eliminate the privacy protection inherent in the "public records" definition.

In its briefs, DPC urged that the General Assembly's use of "demonstrable connection" as applied to "correspondence", implied a broader category of records and a different meaning from the "public records" definition in section 24–72–202(6)(a)(I). DPC argued that elected officials' "correspondence" need not have as close of a nexus to the performance of public functions and the expenditure of public funds as other public records. As such, DPC contended that the e-mail corre-

spondence between Baker and Sale were "public records" because the two held a working relationship in the County Clerk and Recorder's Office. This direct "work" relationship, according to DPC, was enough to show a demonstrable connection to Baker's duties as an elected official. We disagree with this proposition.

First, we acknowledge the minor differences between the language used by the General Assembly in the "public records" definition and the inclusion of elected officials' correspondence in section 24–72–202(6)(a)(II)(B). We attribute these differences, however, to the General Assembly's attempt to relate the *same* descriptive terms in the "public records" definition regarding other forms of records to the various types of correspondence an elected official sends and receives rather than any attempt by the General Assembly to create a *different* or broader definition. Moreover, these minor differences can be attributed to the fact that section 24–72–202(6)(a)(II)(B) is stated in the negative.

Second, were we to interpret "demonstrable connection" as casting a nexus as broad as that urged by DPC, it would render all of section 24–72–202(6)(a)(II)(B) superfluous in that all correspondence between public employees and elected officials could be "connected" to the performance of public functions. This, of course, would be in clear contradiction to the General Assembly's intent to balance privacy interests of public employees and require this Court to find that an elected official cannot engage in private communications with public employees. Such a reading would tip the balance and require the disclosure of personal and private communications clearly outside the "public business." Instead, the inquiry is still content-driven and the communication at issue must still be coupled with the performance of public functions. If the content of the communication pertains to the elected officials' role as an elected official, then it falls within the definition. If an elected official sends or receives a message that is in furtherance of,

**9.** Although DPC did not file its own separate briefs in this case before the district court and court of appeals, DPC did join in the other inter-

vening parties' briefs before the district court and the Board's briefs before the court of appeals.

or pertaining to, her duties as an elected official, then it falls within the definition. If, however, the communication was sent to or from the elected official in furtherance of some other relationship, it does not fall within the definition.[10]

One example taken from the district court proceedings in this case demonstrates this public-private distinction built into the "public records" definition. Following the district court order directing the release of the e-mail messages pursuant to CORA, the Board's attorney requested that the Board be permitted to redact those e-mails relating to the Baker's children. The district court granted the Board's request. Here, it is clear that the Board and the Court recognized that some communications do not address Baker's performance of public functions and were so personal that public disclosure was simply not appropriate. However, were it not for the generosity of the Board, these communications might have been disclosed consistent with the district court's analysis. To the contrary, we find these types of private and personal communications or correspondence were never intended to be disclosed as legitimate and appropriate under CORA. Not because, as here, a party pursuing release of the records asked the court to redact the messages, but because such a protection was established in the "public records" definition.

The legislative proceedings leading up to the enactment of the 1996 amendments buttress our reading of the statute.

Like the enactment of CORA in 1968, privacy interests were a prime concern during the legislative committee review of the 1996 amendments. When introducing the proposed legislation during committee review, the bill's sponsor, Senator Wells, explained that the amendment was intended to apply to all state employees and designed to treat e-mail the same way facsimiles and postal mail were treated under the original CORA provi-

sions. *See An Act Concerning Public Access to Governmental Processes, and, in Connection Therewith, Amending the Public Records and Open Meetings Laws to Address Issues Raised by the Use of Electronic Mail by Governmental Agencies: Hearing on S.B. 96–212 before Senate Comm. on Business Affairs and Labor,* 60th Gen. Assemb., 2nd Sess. (March 11, 1996). He explained that the amendments were not intended to extend to "personal information", including "facts about lives" that inherently convey an "expectation of confidentiality." *Id.*

In discussing the amendments, Senator Wells also explained that the inquiry into whether or not e-mail messages are public records must be a content-driven inquiry. *Id.* More specifically, only records made, maintained, or kept in performance of official duties (relating to the public function) are subject to disclosure. *Id.* Senator Wells explained how the amendments would affect interoffice e-mail:

> [Public employees might be] doing stuff [on work e-mail systems or internet] that are not really part of their official duties. [But the] crux of this Bill is to say it is the record that makes it ... a public record or not. [For example,] two state employees are e-mailing back and forth with each other ... they might be in violation of a personnel rule, but violation of a personnel rule does not make it therefore a public record.... It is a public record if it is maintained or kept in the performance of their duties. The State can handle personnel through the personnel system .... If it is personal, it is personal. If made, maintained, or kept in the performance of one of your official capacities, then it is a public record. Otherwise it is not a public record. Period.

*Id.*

Concerns were also raised that the amendment adding elected officials' correspondence might be too invasive. At least one Repre-

---

**10.** We also point out that the mere inclusion of, or reference to, a "public record" does not convert the entire writing into a "public record". *See Wick,* 81 P.3d at 366 (citing *Forsham v. Harris,* 445 U.S. 169, 176, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) for the proposition that "data

which merely serves as the basis for a public document is not a public record under [the Freedom of Information Act]"). Instead, the reference to such a record is the "public record" and any record incorporated by reference must also meet the "public record" definition.

sentative expressed concern that he did not want to lose privacy as a result of the legislation. *See An Act Concerning Public Access to Governmental Processes, and, in Connection Therewith, Amending the Public Records and Open Meetings Laws to Address Issues Raised by the Use of Electronic Mail by Governmental Agencies: Hearing on S.B. 96–212 before House Committee on State, Veteran, and Military Affairs,* 60th Gen. Assemb., 2nd Sess. (April 9, 1996) (comments of Rep. Tupa). It was clarified at this committee meeting that, like other records, the inquiry as to whether correspondence is a "public record" focuses on what the communication includes, rather than how it was produced. *See id.* That is, simply because an e-mail message was produced by an elected official or created "using state equipment" does not make it a public record. *Id.*

█ We conclude, based our previous case law, the history of CORA and the plain language of the 1996 amendments, that CORA's definition of "public records" limits the type of records covered by CORA and specifically distinguishes between e-mail messages that address the performance of public functions or the receipt or expenditure of public funds and those that do not. Furthermore, the inclusion of an elected official's correspondence, namely the official's e-mail messages, does not eliminate the privacy protection inherent in the "public records" definition and does not extend the scope of CORA beyond records of public business.

Having clarified and set forth the standard for determining the scope of CORA with respect to e-mail messages, we now turn to the court of appeals' opinion and the e-mail messages at issue.

### C. Application

█ We first review the court of appeals' opinion and its interpretation and application of the "public records" definition. Because we find the court of appeals misinterpreted

the definition, we remand the case to the court of appeals for return to the district court.

### 1. Court of appeals' opinion

The court of appeals found that all of the messages at issue, regardless of their content, were public records subject to the provisions of CORA. *In re Bd. of Comm'rs,* 95 P.3d at 597. It did so on the basis that the messages were "writings" as defined by section 24–72–202(7) and were maintained by the county.[11] *Id.* The fact that these e-mails were "writings" maintained by the County, however, is insufficient to find the e-mails were a "public record". Furthermore, simply because the messages were sent and received by Baker, an elected official, is not dispositive. The court of appeals failed to take into account the specific nature of the e-mails and their individual content to determine if they address the performance of public functions. An analysis of the messages based solely on the context in which they were created, without an examination of the content of the messages, is insufficient to determine whether the messages are "public records".

Additionally, the court of appeals incorrectly applied section 24–72–202(6)(a)(II) as a separate and distinct "official correspondence exception" to the "public records" definition. *See In re Bd. of Comm'rs,* 95 P.3d at 597–98. We do not view "official correspondence" as an exception to the "public records" definition. Rather, as we read section 24–72–202(6)(a)(II), it specifically includes and excludes elected officials' correspondence from the "public records" definition, but it does not create an "exception."

As a whole, section 24–72–202(6)(a) defines what is a "public record". Specifically, the statute first sets forth the definition of "public records". *See* § 24–72–202(6)(a)(I). Next, it specifies whether elected officials' correspondence are public records. *See*

11. The court of appeals stated the "Baker and Sale do not dispute that the e-mails are public records because CORA's definition of 'writings' expressly includes them." *In re Bd. of Comm'rs,* 95 P.3d at 597. Though we do not believe the court of appeals was stating that Baker and Sale

conceded that the e-mail messages were public records, we nevertheless recognize after a review of the record that Baker and Sale have, at all times, maintained the position that most of the e-mail messages are not, in fact, public records.

§ 24–72–202(6)(a)(II). Last, the statute clarifies that the use of public funds in creating the records does not, by itself, make any record a "public record". *See* § 24–72–202(6)(a)(III).

When applying section 24–72–202(6)(a)(II) the court of appeals found that all of the messages entailed the expenditure of public funds and therefore declined to address whether the content of the e-mail messages addressed the performance of public functions or the receipt or expenditure of public funds. *In re Bd. of Comm'rs*, 95 P.3d at 597–98. Specifically, the court found that the messages were sent while Baker and Sale were being compensated as county employees, the messages were sent on a county-funded e-mail system, and the county-owned computers and pagers used to send the messages were purchased and maintained by public funds, but the court did not consider the content of the messages. *Id.* at 598.

Because the court of appeals viewed "official correspondence" as an exception to the "public records" definition, it did not apply section 24–72–202(6)(a) as a whole. Thus, the court did not take into account that the expenditure of public funds to create the messages, pursuant to section 24–72–202(6)(a)(III), is insufficient to deem the e-mail messages "public records". Because section 24–72–204(6)(a)(III), provides that the public official's acceptance of public funds or use of publicly-owned equipment does not convert a record that is not otherwise a "public record" into a "public record", we do not agree with the court of appeals' analysis.

Section 24–72–202(6)(a)(III), when read together with all of section 24–72–202(6)(a), also rebuts any argument that the use of public funds to create, store, or transmit the e-mail messages satisfies the requirement that the messages "involve the receipt or expenditure of public funds." Whether looking to the precise language of section 24–72–202(6)(a)(I) or section 24–72–202(6)(a)(II)(B) to determine if a record or an elected official's correspondence is a "public record", section 24–72–204(6)(a)(III) applies and clarifies that the concept of involving public funds means more than acceptance of public funds or use of publicly-owned equipment. Be-

cause the General Assembly did not intend the scope of CORA's disclosure requirements to include records solely because the records were created with the use of public funds, we must focus on the content of the record to determine if the record "involves the receipt or expenditure of public funds."

After considering the content of the e-mail messages, as required by the statute, we conclude that not all of the e-mail messages at issue here have a demonstrable connection to the performance of public functions or involve the receipt or expenditure of public funds. It is apparent that a large portion of the e-mail messages instead contain only sexually-explicit exchanges between Baker and Sale. Based upon the content of the e-mails, it is clear they were sent in furtherance of their personal relationship and were not for use in the performance of the public functions of the Clerk and Recorder's Office. These messages demonstrate very private exchanges that convey the "every thought and feeling" of a public official that we sought to guard from disclosure in *Wick. See id.* at 365. The only discernable purpose of disclosing the content of these messages is to shed light on the extent of Baker and Sales' fluency with sexually-explicit terminology and to satisfy the prurient interests of the press and the public.

Accordingly, not all of the e-mail messages at issue are public records under CORA. Furthermore, because the privacy interests raised by Baker and Sale under the circumstances of this case should have been protected through the correct application of the "public records" definition, it is not necessary to reach the constitutional privacy issue.

Likewise, we need not address the second issue for which we granted certiorari because it is inherently dependent upon the constitutional privacy issue and a finding that the messages are, in fact, "public records". DPC contends that the messages are "public records" and the only person to contest their release is the custodian of records pursuant to section 24–72–204(6) if the release would cause "substantial injury to the public interest." Where, as we decide here, there is no finding the messages are "public records", the portion of section 24–72–204(6) address-

ing the custodian's discretion to release the "public records" is not applicable.

Given the court of appeals' erroneous understanding of the "public records" definition and the error in the district court's order finding that all of the messages were "public records", we reverse the court of appeals' interpretation and application of the "public records" definition and remand with the directions to return the case to the district court for findings consistent with this opinion.

## 2. Application on remand

Given the complex procedural history and findings of the court below, we find it useful to first review what messages are and are not at issue.

The investigative report that gave rise to this case identified 622 e-mail messages between Baker and Sale. Of those messages, the report indicated that 570 contain sexually explicit material. The report does not, however, separately specify those 570 messages. The district court in this case found that all of the 622 e-mail messages contained in the investigative report were "public records". As such, the court ordered the messages disclosed as part of a non-redacted version of the report. The district court's order included the disclosure of those messages contained in the Sexual Harassment/Hostile Environment subreport. To protect the parties pending an appeal of the order, the district court issued a stay prohibiting the release of any records.

On appeal, the court of appeals also found that all 622 messages were "public records". The court did not, however, require disclosure of all of the messages because it concluded that some messages were protected by an implied constitutional privacy exception. The court also found that the messages contained in the Sexual Harassment/Hostile Environment subreport and any e-mail messages concerning the sexual harassment allegations that identified any parties other than

Baker or Sale were protected from disclosure pursuant to the express provisions of CORA.

During the proceedings before the court of appeals, Baker and Sale conceded in their briefs that 101 of the 622 messages were "public records" on the basis that the messages had a "demonstrable connection" to Baker's function as an elected official, but disputed that the remainder of the messages met the definitional requirements. According to their briefs, the 101 messages they identified "related to county business and county functions" and were not related to "passionate and explicitly sexual messages." Following the court of appeals' opinion, upon a motion by DPC, the court of appeals gave limited relief from the stay prohibiting the release of the messages and ordered the release of the 101 e-mails to DPC.

Accordingly, the messages at issue on appeal before this Court are the 521 messages that Baker and Sale have not agreed were "public records" minus those described by the court of appeals as messages not disclosable under the sexual harassment exception.[12]

Having reviewed the record in this case and a non-redacted version of the investigative report, we find that each of the remaining messages could fall into one of three groups: 1) messages that address the performance of public functions that do not contain any personal information or sexually-explicit content; 2) messages that do not address the performance of public functions and do contain sexually-explicit content or other private communications; and 3) mixed messages containing both types of the foregoing communications. We address each group, in turn, below.

The first group of e-mail messages contains those types of communications, as we discussed above, that CORA seeks to make available to the public through its mandatory disclosure provisions. The content of these messages directly relate to Baker's function as an elected official or the expenditure of public funds. Many, if not all, of these mes-

---

12. Although Petitioner sought review of the court of appeals' holding with regard to the e-mail messages associated with the Sexual Harassment/Hostile Environment subreport, we denied certiorari as to "[w]hether the sexual harassment exception to disclosure of public records applies to e-mails that are attached to a report on sexual harassment."

sages have been disclosed as part of the 101 messages released following the court of appeals' opinion.

The second group of e-mail messages contains those types of private communications the General Assembly intended to protect as private and fall outside the "public records" definition. These messages were sent and received in furtherance of the personal relationship between Baker and Sale and do not address the performance of their public functions. Most of the remaining messages fall into this group.

The third group-e-mail messages that contain both public and private communications-cause some difficulty as the competing policy interests for and against disclosure are equally present within the same message. Requiring disclosure of the entire e-mail message under the circumstances would contravene the General Assembly's intent to protect such communications and make what is otherwise a private communication a public communication simply because it was sent in the same message. In reaching such a conclusion, not only would we "discourage public service, we would create an arena of gossip and scandal instead of facilitating a forum of open and frank discussion about issues concerning public officials and the citizenry they serve." *Wick*, 81 P.3d at 365–66. In contrast, were we to prohibit disclosure of the messages altogether, we would be limiting access to public business and deprive the citizens of Colorado of what the General Assembly has deemed a necessity to our democratic government. Additionally, such a conclusion would serve to encourage public employees and public officials to include private communications in e-mail messages to shield public communications from the provisions of CORA.

We see no problem, however, requiring that such messages be redacted by the district court to exclude from disclosure those communications within the messages that do not address the performance of public functions.[13] CORA does not mandate that e-mail

records be disclosed in complete form or not at all. Nor do we believe that it is practical, given the widespread use of e-mail for private and business uses inside and out of government, to require public officials and public employees to maintain a distinction each time a message is sent or, equally as important, when an e-mail message is received. Accordingly, we believe this resolution best balances the competing interests involved and is consistent with the General Assembly's intent to do the same.

In applying our analysis to the messages at issue here, we believe the privacy interests involved are protected consistent with the intent of the General Assembly. In addition, we believe our analysis eliminates the constitutional privacy concerns raised by Baker and Sale and contested by DPC in this appeal. Messages, or portions of messages, that are found to be "public records" pursuant to our analysis as applied by the district court on remand are not likely to give rise to any argument that they are entitled to constitutional privacy protection.

### III. Conclusion

We conclude that the court of appeals and the district court did not correctly interpret and apply CORA's "public records" definition. Accordingly, we reverse in part, affirm in part, and remand with directions.

---

13. Nothing in this remand order should be construed to suggest the district court is without power to require the custodian of records for the Board to initially redact the e-mail messages in accordance with these directions and for possible subsequent review by the district court if the custodian proposal is contested.