141 P.3d 780

**Stanley GRIFFIS, Plaintiff/Appellant,**

**v.**

**PINAL COUNTY, Defendant/Appellee,**

**and**

**Phoenix Newspapers, Inc., an Arizona corporation, Intervenor/Appellee.**

**No. 2 CA–CV 2006–0052.**

Court of Appeals of Arizona, Division 2, Department A.

Aug. 4, 2006.

Review Granted Jan. 9, 2007.

Fennemore Craig, By Timothy Berg, Janice Procter–Murphy, and Theresa Dwyer, Phoenix, for Plaintiff/Appellant.

Robert Carter Olson, Pinal County Attorney, By Chris M. Roll and Allen C. McVey, Florence, for Defendant/Appellee.

Steptoe & Johnson, LLP, By David J. Bodney, Peter S. Kozinets, and Chris Moeser, Phoenix, for Intervenor/Appellee.

## OPINION

PELANDER, Chief Judge.

¶ 1 This case raises a central issue of whether personal electronic mail messages (e-mails) sent or received by a government employee constitute "public records" that are presumptively open to public inspection under Arizona's Public Records Law, A.R.S. §§ 39–101 through 39–161, simply because the e-mails were transmitted on and are retained in a government-owned computer system. The trial court ruled that they do and, therefore, ordered appellee Pinal County to disclose to appellee Phoenix Newspapers, Inc. (PNI) all such e-mails, after redaction of

certain confidential information, sent or received during a two-month period by plaintiff/appellant Stanley Griffis, former Pinal County Manager. Griffis appeals from the trial court's order dissolving a preliminary injunction the court previously had issued on his request. This court has jurisdiction pursuant to A.R.S. § 12–2101(F)(2). For the reasons set forth below, we affirm one portion of the trial court's order but reverse the balance.

## BACKGROUND

¶ 2 The procedural history of this case is undisputed. Griffis served as Pinal County Manager for sixteen years until his suspension in early December 2005. During his employment, Griffis signed a form acknowledging that e-mail messages sent or received on the County's e-mail system "are generally considered public records." In addition, at all pertinent times, Griffis was subject to Pinal County's written policies relating to internet access and e-mail usage. Those policies provided, inter alia: all e-mail messages are county property and "not the private property of any employee;" e-mail messages "are considered Public Records, unless they fall into one of three exemption categories: (1) Confidentiality, (2) Personal Privacy, or (3) Best Interest of the State;"[1] "the County reserves the right to review, audit, intercept, access and disclose all messages created, received, or sent over the [County's e-mail] system;"[2] and "[e]mployees have no right of privacy, nor any expectation of any right of privacy, when accessing the Internet by use of County equipment."[3]

¶ 3 In early December 2005, the County placed Griffis on administrative leave to investigate allegations he had purchased weapons with funds belonging to the county sheriff without obtaining the sheriff's approval. Griffis apparently retired from the County shortly thereafter. At or around the time he was suspended, PNI began reporting on the investigation into Griffis's alleged misuse of public funds. Pursuant to Arizona's Public Records Law, § 39–121, PNI requested that the County provide it with all of Griffis's incoming and outgoing e-mail messages from October 1 to December 2, 2005.

¶ 4 In January 2006, the County released approximately 700 of Griffis's e-mail records to PNI. In doing so, however, the County withheld or redacted several hundred of Griffis's e-mails the County deemed personal in nature.[4] After PNI threatened the County

---

1. Both policies defined "public record and 'other matters' " to include:
   a. A record that is made by a public official in the pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference.
   b. A record that is required by law to be kept, or necessary to be kept in discharge of a duty imposed by law to serve as a memorial and evidence of something written, said, or done.
   c. A written record of transaction of a public officer in his/her office, which is a convenient and appropriate method of discharging his/her duties, and is kept by this employee as such, whether required by express provisions of law or not.
   d. Few records in the possession or control of a public officer or body generally will not be "public records." Exceptions are: work-in-progress, i.e., a work that is not yet finished, or information that is used solely as a memory aide, i.e., post-it notes.
2. Interestingly, the County's Internet access and e-mail policies also stated: "No Internet (or electronic) messages may be monitored, reviewed, audited, intercepted, accessed, or disclosed without authorization of the County Manager." But

at the time Pinal County disclosed or sought to disclose Griffis's e-mails, he was no longer serving as County Manager.

3. The e-mail policy stated that the County's system was provided "to assist in the conduct of business within the County." But the policy also provided:

   In addition to the use of electronic mail in the performance of their job duties, employees may make limited personal use of electronic mail under the following circumstances:
   a. Scheduling of personal appointments as an effective extension of one's over all [sic] time management, i.e., lunches, meetings, etc.
   b. Sharing of event driven information and planning of work-related social events where the intent is to enhance employee morale, i.e., birthdays, marriages, births, etc.
   c. Other limited uses that do not violate County or departmental policy.

4. The County identified the following ten categories of information it had redacted from various documents: (1) personal e-mail addresses; (2) personal telephone numbers; (3) private citizen names and e-mail addresses; (4) personal benefits or health account information; (5) bank account numbers; (6) personnel issues; (7) person-

with legal action, the County agreed to release all of Griffis's e-mails but first gave him an opportunity to seek court protection from release of personal e-mails.[5]

¶ 5 In early February 2006, Griffis filed this action, seeking to block the release of 120 Pinal County e-mail records he asserted "were documents of a personal nature," including "communications regarding a personal vacation and . . . purchases from online retailers." In its answer to Griffis's complaint, the County admitted the e-mail documents in question were of a personal nature.[6] After an ex parte hearing in which the County declined to participate, the trial court issued a temporary restraining order and then a preliminary injunction prohibiting release of the documents Griffis had sought to protect.

¶ 6 PNI successfully intervened in the case and filed a motion, in which the County joined, to dissolve the preliminary injunction. At the trial court's instruction, the County prepared a log that identified each individual e-mail subject to the preliminary injunction. After Griffis redacted from the log all information he deemed purely personal, the redacted log was furnished to PNI and the County. Griffis also consented to the release of thirty of the e-mails for which he previously had sought protection and which had been covered by the preliminary injunction.

¶ 7 After receiving the parties' briefs and hearing argument, the trial court granted PNI's motion to dissolve the preliminary injunction and ruled that the remaining ninety e-mail records should be disclosed after redaction of "personally identifying information" such as dates of birth, social security numbers, personal addresses or telephone numbers, credit card numbers, any bank account numbers, or customer identification numbers. The trial court ruled as a matter of law "everything that is on a computer of the Pinal County . . . governmental entity is presumed to be a public record," "any records generated on a public computer are presumptively open to public inspection," and the party objecting to disclosure must "establish some expectation of privacy which outweighs the right of the public to know what private matters are being involved or being engaged in on public time with public funds."

¶ 8 Finding insufficient Griffis's generalized assertions that his "privacy" or "reputation" would be invaded by release, and absent any request by Griffis for an in camera inspection of the e-mail records in question, the trial court ruled Griffis had not overcome the presumption of public access. Therefore, the court ordered the release of all the disputed e-mail records after redaction by Griffis of the excluded information. The trial court granted a limited stay, which this court extended after Griffis timely appealed from the trial court's order.

## STANDARD OF REVIEW

¶ 9 We generally review a trial court's order dissolving a preliminary injunction for abuse of discretion. *See Nu–Tred Tire Co. v. Dunlop Tire & Rubber Corp.*, 118 Ariz. 417, 420, 577 P.2d 268, 271 (App.1978). But a trial court's determination of what constitutes a public record is a question of law subject to our de novo review. *Cox Ariz. Publ'ns, Inc. v. Collins*, 175 Ariz. 11, 14, 852 P.2d 1194, 1198 (1993) ("Whether the denial of access to public records is wrongful is an issue of law which we review de novo."); *see*

---

al e-mails; (8) ongoing litigation; (9) Homeland Security information; and (10) attorney/client privileged communications. In response, PNI asserted: "Of the 10 categories enumerated by the County, only three—personal/health benefits, bank account numbers and attorney-client communications—provide a *potential* basis to redact any information. The remaining redactions are either completely unfounded, or based on entirely speculative categories of information."

**5.** Just before filing this action, Griffis informed the County that many of the documents it intended to release to PNI "are personal communications that in no way implicate Mr. Griffis' duties

as County Manager" and, therefore, "should not be turned over to the Arizona Republic as part of its public records request." According to Griffis, those documents included: "[m]ultiple copies of an itinerary for a personal trip taken by Mr. Griffis to Africa; [m]ultiple emails regarding that trip; [e]mail advertisements for merchandise from online retailers; and [c]ommunications regarding online purchases of a purely personal nature."

**6.** The County later asserted that a November 7, 2005, e-mail involved County business and should have been produced in its entirety. The County also maintains that position on appeal.

*also Ariz. Bd. of Regents v. Phoenix Newspapers, Inc.,* 167 Ariz. 254, 257, 806 P.2d 348, 351 (1991) ("We are not bound by the trial court's conclusions of law and are free to draw our own conclusions of law from the facts found by the trial court."). Here, after considering the parties' written and oral arguments on the issues but without conducting any evidentiary hearing, the trial court dissolved the preliminary injunction based on its legal conclusion that all e-mails contained on the County's computer system are public records under § 39–121. Therefore, our review of that order is de novo.

## DISCUSSION

### I

¶ 10 We begin our analysis by addressing the applicable Arizona statutes relating to public records and the most pertinent cases that have interpreted and applied those laws. Under § 39–121.01(B), "[a]ll officers and public bodies shall maintain all records ... reasonably necessary or appropriate to maintain an accurate knowledge of their official activities and of any of their activities which are supported by monies from the state or any political subdivision of the state." Subsection (D) of that statute provides that, "[s]ubject to § 39–121.03[,][a]ny person may request to examine or be furnished copies, printouts, or photographs of any public record during regular office hours." § 39–121.01(D)(1). Similarly, § 39–121 states that "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours." The Public Records Law, however, does not define "public records and other matters."

¶ 11 Consequently, Arizona courts have been called on to give meaning and effect to the law in various contexts. In *Mathews v. Pyle,* 75 Ariz. 76, 251 P.2d 893 (1952), a newspaper sought to inspect certain investigative documents furnished by the Attorney General to the governor. Then, as now, Arizona's public records statute, former A.C.A. § 12–412 (1939), included but did not define "public records" or "other matters." Drawing on other states' common law, however, our supreme court embraced the following three-part definition of "public record:"

— A record "made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference[;]"

— A record that is required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law or directed by law to serve as a memorial and evidence of something written, said or done;

— A written record of transactions of a public officer in his office, which is a convenient and appropriate method of discharging his duties, and is kept by him as such, whether required by express provisions of law or not.

*Id.* at 78–79, 251 P.2d at 895, *quoting State ex rel. Romsa v. Grace,* 43 Wyo. 454, 5 P.2d 301, 303 (1931). The court concluded that the documents received by the Governor in his official capacity were not intended to be classified by the legislature as public records, but they may fall within the classification of "other matters" ... and therefore subject to inspection by an interested citizen unless they are confidential or of such a nature that it would be against the best interests of the state to permit a disclosure of their contents.

*Id.* at 80, 251 P.2d at 896.

¶ 12 In *Carlson v. Pima County,* 141 Ariz. 487, 687 P.2d 1242 (1984), an inmate filed a defamation action against Pima County and its sheriff, among others, based on the release of an "offense report" under the Public Records Law. The report implicated the plaintiff/inmate in an alleged assault on another inmate. In affirming the trial court's directed verdict in favor of defendants, our supreme court held:

A.R.S. § 39–121.01(B) requires the keeping of records sufficient to provide the public with "knowledge" of all of the activities of a public officer and of the manner in which he conducts his office and performs his duty. For purposes of inspection and access, all records required to be made and maintained by § 39–121.01(B) and preserved by (C) are to be available for inspection under § 39–121 and copying under § 39–121.01(D), subject to the official's

discretion to deny or restrict access where recognition of the interests of privacy, confidentiality, or the best interest of the state in carrying out its legitimate activities outweigh the general policy of open access. *Carlson,* 141 Ariz. at 491, 687 P.2d at 1246.

¶ 13 In so holding, the court in *Carlson* observed that the legislature's 1975 amendments to § 39–121.01(A) and (B) "appear to define those matters to which the public right of inspection applies more broadly" than the court's previous, three-part definition of "public record" in *Mathews.* 141 Ariz. at 489, 687 P.2d at 1244. Addressing the question of what constitutes public records or other matters for purposes of the public's right to inspection, *id.,* the court in *Carlson* stated:

> Section 39–121.01(B) creates a statutory mandate which, in effect, requires all officers to make and maintain records reasonably necessary to provide knowledge of all activities they undertake in the furtherance of their duties. We think that the objective implicitly expressed in § 39–121.01 is to broadly define those records which are open to the public for inspection under § 39–121, thus obviating the need for any technical distinction between "public records" or "other matters," insofar as the right to inspection by the public is concerned. *Cf. Mathews v. Pyle, supra.* In so holding, we approve of dispensing with an initial determination of whether a document is a "public record" or an "other matter" and moving directly to a determination of whether or not the countervailing interests enunciated in *Mathews v. Pyle, supra,* override the policy of disclosure.

*Id.* at 490, 687 P.2d at 1245.

¶ 14 Turning to the public's right of inspection, and after noting that *Mathews* had "dealt with a report which [the] Court determined *not* to be a public record, but which fell within the 'other matters' wording of A.R.S. § 39–121," *id.,* the court in *Carlson* stated:

> We hold today that the common law limitations to open disclosure are not based on any technical dichotomy which might be argued under the "public records" or "other matters" wording of A.R.S. § 39–121, but rather are based on the conflict between the public's right to openness in government and important public policy considerations relating to protection of either the confidentiality of information, privacy of persons or a concern about disclosure detrimental to the best interests of the state. This has been the general basis for the common law rule. The enactment of A.R.S. § 39–121.01 did not expressly limit the doctrine of *Mathews v. Pyle* and we do not believe that the current statutory scheme, which is all-inclusive in its requirements of record keeping, was intended by the legislature to overrule the balancing scheme adopted in *Mathews v. Pyle.* However, we do think that the combined effect of § 39–121 and §§ 39–121.01, 121.02 and 122 evince a clear policy favoring disclosure.

*Id.* Similarly, the court later stated, "[i]n light of our statutory policy favoring disclosure, we think that the best procedure is that all records required to be kept under A.R.S. § 39–121.01(B) are presumed open to the public for inspection as public records," but "the officer or custodian may refuse inspection" when "the countervailing interests of confidentiality, privacy or the best interests of the state" are "appropriately invoked." *Id.* at 491, 687 P.2d at 1246. "Such discretionary refusal is subject to judicial scrutiny." *Id.*

¶ 15 Our supreme court later expounded on and clarified *Carlson* in *Salt River Pima–Maricopa Indian Community v. Rogers,* 168 Ariz. 531, 815 P.2d 900 (1991). There, the Indian Community sought to prevent the state treasurer from disclosing a check distribution list, created by a private escrow company, that related to the state's purchase of a right-of-way across tribal lands and contained personal information about the Community's members. *Id.* at 533, 815 P.2d at 902. The list was found in the treasurer's office but was not part of his records. *Id.* The sole issue in that special action was "whether the check distribution list is a 'public record' or 'other matter' of the state of Arizona and therefore subject to disclosure under Arizona's Public Records Law." *Id.* In concluding it was not, the court stated:

> The determination of whether the check distribution list is within the class of rec-

ords subject to disclosure does not depend upon its physical location in the treasurer's office or the fact that the computer program used in generating the list was developed with state funds. The issue is whether the treasurer generated or used the list in a capacity related to the duties of that office. The record does not support such a finding.

*Id.* at 542, 815 P.2d at 911.

¶ 16 Rejecting various arguments PNI advanced in that case, the court in *Salt River* concluded that the check distribution list was neither a "public record" nor "other matter" subject to inspection under § 39–121 and, therefore, did not "reach the issue of whether disclosure [was] barred by 'countervailing interests of confidentiality, privacy or the best interests of the state....' " 168 Ariz. at 542, 815 P.2d at 911, *quoting Carlson,* 141 Ariz. at 491, 687 P.2d at 1246. The court also noted, "[i]n most cases, the fine distinction between public records and other matters is not a point in controversy." *Id.* at 537, 815 P.2d at 906. The court continued: "Therefore, where the record may fall within either category, we 'dispens[e] with an initial determination of whether a document is a "public record" or an "other matter" and mov[e] directly to a determination of whether or not the countervailing interests enunciated in *Mathews v. Pyle* ... override the policy of disclosure.' " *Id.* at 537–38, 815 P.2d at 906–07, *quoting Carlson,* 141 Ariz. at 490, 687 P.2d at 1245 (alterations in *Salt River* ).

¶ 17 The court in *Salt River* further observed that the superior court, which had ordered disclosure, "may have assumed that the list was within the category of documents subject to disclosure under A.R.S. § 39–121.01 and dispensed with the initial determination of whether the list was a public record or other matter to reach the determination of whether its release would have a harmful effect on the duties of an official or agency." *Id.* at 536, 815 P.2d at 905. But, the court stated, "[t]hat approach is improper when, as in [*Salt River* ], the facts raise a substantial question as to the threshold determination of whether the document is subject to the statute." *Id.* Thus, "the first issue" the court addressed was "whether the check distribution list [was] a public record or other matter

of the state rather than a private federal-tribal record." *Id.* at 538, 815 P.2d at 907.

¶ 18 PNI argued in *Salt River* that, "because the state treasurer possessed the check distribution list, it qualifies as a public record." *Id.* Rejecting that argument, the court stated "the mere fact that a writing is in the possession of a public officer or public agency does not make it a public record." *Id.* Rather, the court reasoned, " '[i]t is the nature and purpose of the document, not the place where it is kept, which determines its status.' " *Id., quoting Linder v. Eckard,* 261 Iowa 216, 152 N.W.2d 833, 835 (Iowa 1967). Referring to its prior decision in *Mathews,* 75 Ariz. at 78, 251 P.2d at 895, the court in *Salt River* confirmed that "[t]he term 'public record' comprehends [the] three alternative definitions" set forth in *Mathews. Salt River,* 168 Ariz. at 538, 815 P.2d at 907; *see* ¶ 11, *supra.*

¶ 19 The court in *Salt River* concluded that the check distribution list did not fall within any of those three categories. First, the list "was not 'made by a public officer in the pursuance of a duty.' " 168 Ariz. at 538, 815 P.2d at 907, *quoting Mathews,* 75 Ariz. at 78, 251 P.2d at 895. Second, "the treasurer did not have a statutory duty to keep the check distribution list, did not compile the list, did not use the list, and did not even consult it in performing his duties." *Id.* at 538–39, 815 P.2d at 907–08. Third, "the list was neither relevant, convenient, nor appropriate to any discharge of the treasurer's duties." *Id.* at 539, 815 P.2d at 908. Accordingly, "the check distribution list [did] not qualify as a public record held in the treasurer's official capacity." *Id.*

¶ 20 The court then considered whether the list constituted an "other matter" and concluded it did not. *Id.* "The term 'other matters,' " the court noted, "includes only *public* matters." *Id.* "Two factors are of particular importance: whether the document is held in the official capacity of the state officer; and, if so, whether the public has a legitimate interest in the document that outweighs any governmental promise of confidentiality that has been made." *Id.* Because "there [was] no evidence that the treasurer received the check distribution list in

his official capacity," *id.*, the list did not constitute an "other matter." *Id.* at 539–40, 815 P.2d at 908–09.

¶ 21 PNI also argued for disclosure in *Salt River* "because state funds were expended to *assist* in the disbursement of funds" to the Indian landowners and the state treasurer held the check distribution list "to maintain an accurate knowledge of [the state's] expenditure of state funds." *Id.* at 540, 815 P.2d at 909. Finding that argument "unpersuasive," *id.*, the court stated, "the public has no right of access to private records located in government offices that have no relation to the agency's activities." *Id.* at 541, 815 P.2d at 910. Further, "the public does not have a right to demand access unless the record has a substantial nexus to the agency's activities." *Id.* Applying a "control test," *id.*, the court stated that "[a]n agency's mere possession of private information does not make that information subject to disclosure under A.R.S. § 39–121," particularly when the agency "neither generated the document nor used the document for an agency purpose." *Id.* at 542, 815 P.2d at 911. The court concluded, "[a]bsent evidence that the treasurer used the list to effectuate any of the duties of state government, or h[eld] the list to memorialize those duties," the list was not subject to inspection as either a public record or other matter. *Id.*

¶ 22 Several years after *Salt River*, this court decided *Star Publishing Co. v. Pima County Attorney's Office*, 181 Ariz. 432, 891 P.2d 899 (App.1994). There, a newspaper sought computer backup tapes of the Pima County assessor's office, including e-mail communications of its employees, in connection with allegations of impropriety in that office. *Id.* at 433, 891 P.2d at 900. The county attorney's office, which held the tapes, denied the public records request; but the superior court ordered that office to produce the tapes. *Id.* In challenging that order on appeal, the county attorney argued, inter alia, "some of the material there recorded might not be a public record, ... [or] might be immune from disclosure in order to protect public employee privacy rights." *Id.* at 434, 891 P.2d at 901. This court rejected that argument, noting that only speculation had been offered to resist inspection and "[n]o one has examined the actual records in

this case to demonstrate why any particular individual record ought not be revealed." *Id.*

¶ 23 Citing *Carlson* and other cases, this court also noted "public records are presumed open to the public for inspection unless the public official can demonstrate a factual basis why a particular record ought not be disclosed to further an important public or private interest." *Star Publ'g*, 181 Ariz. at 434, 891 P.2d at 901. Importantly, the court stated in dicta: "It may be that particular documents contained on the computer tapes are not public records within the meaning of *Salt River* .... But since no records have been produced, it is impossible to say." *Star Publ'g*, 181 Ariz. at 434, 891 P.2d at 901. Finally, the court stated, again in dicta: "While we doubt that public employees have any legitimate expectation of privacy in personal documents that they have chosen to lodge in public computer files, we are unable to even assess the nature of any claim they might have, given the paucity of this record." *Id.*

## II

¶ 24 As noted earlier, the trial court ruled as a matter of law "everything that is on a [Pinal County] computer ... is presumed to be a public record" and "any records generated on a public computer are presumptively open to public inspection." Relying primarily on *Salt River*, Griffis argues "[t]he threshold determination under the Public Records Law—which the trial court erroneously bypassed—is whether the documents are, in fact, public records or other matters subject to disclosure." According to Griffis, "the trial court erred by refusing to make a threshold determination as to whether [his] wholly personal e-mails are public records subject to the Public Records Law." That law, Griffis further contends, "extends only to public records," and "personal e-mails need not be disclosed to the public until a threshold determination is made that the e-mails are, in fact, public records."

¶ 25 Based on *Salt River*, Griffis further argues "the personal documents at issue here are not public records." According to him, a document is a "public record" only if it falls within one of the three categories set forth in

*Mathews* and reiterated in *Salt River.* Under *Salt River,* Griffis asserts, "the document must have some relation to the official duties of the public officer or agency for it to fall within the scope of the statute," and "[t]his crucial nexus is absent here."

¶ 26 Similarly, Griffis contends the trial court "ignore[d] the test of what is a public record: whether the information sought was created or received in furtherance of some public duty or business." He further asserts his "personal e-mails were not public records because they were not created for County business and were not used for County business; nor did anyone rely on such documents to transact County business." Because his personal e-mails were not public records, Griffis maintains, "it is irrelevant whether he can establish an exception to disclosure under the Public Records Law," and there is no "need to consider the countervailing interests."

¶ 27 Griffis also contends his personal e-mails do not constitute "other matters" within the meaning of § 39–121, again relying on *Salt River.* As noted earlier, the court in *Salt River* construed the phrase "other matters" to include "only *public* matters." 168 Ariz. at 539, 815 P.2d at 908. "Because [his] personal e-mails do not concern public matters," Griffis argues, "the e-mails do not fall within the definition of the 'other matters' requiring disclosure under the Public Records Law."

¶ 28 In response, PNI argues the trial court ruled correctly because "Griffis' Pinal County e-mail records are 'public records or other matters' that are presumptively open to public inspection and copying under the Public Records Law." According to PNI, "Griffis' reliance on *Salt River* could not be

more misplaced." Citing "vast factual differences between this case and *Salt River,*" PNI argues "none of the factors that formed the basis of *Salt River* is present in this case, and *Salt River* is inapposite." [7]

¶ 29 Rather, PNI contends, the "watershed *Carlson* opinion ... sets forth the governing framework for resolving disputes under the Public Records Law." Under *Carlson,* PNI asserts, the trial court correctly presumed that all of Griffis's e-mails are public records because they were "sent or received on the County's computer system during his final two months in office—and while he was already under investigation ... for embezzlement and misuse of public funds." [8] Therefore, PNI argues, the documents are " 'sufficient to provide the public with "knowledge" of all of the activities of [Griffis] and of the manner in which he conduct[ed] his office and perform[ed] his duty' in the weeks before the Board of Supervisors placed him on administrative leave." *Carlson,* 141 Ariz. at 491, 687 P.2d at 1246.

¶ 30 We do not read *Salt River* as narrowly or *Carlson* as broadly as PNI and the County both urge. Here, as in *Salt River,* and contrary to PNI's contention, "the facts raise a substantial question as to the threshold determination of whether the document[s][are] subject to the statute." 168 Ariz. at 536, 815 P.2d at 905. Therefore, the trial court's "approach [was] improper" when it bypassed that initial determination and, instead, merely presumed that all of the disputed e-mails are public records and "presumptively open to public inspection." *Id.*

---

7. As PNI correctly points out, "the check register in *Salt River* was created by a private company, and had 'inexplicably' appeared in the State Treasurer's office," 168 Ariz. at 540, 815 P.2d at 909; "the record in *Salt River* contained information belonging to a sovereign Indian tribe that is *not* subject to the Public Records Law"; and "the information in the check register was *confidential* as a matter of tribal and federal law." Although *Salt River* clearly is factually distinguishable from this case, the court's holding and clarification of *Carlson*'s scope were not based on those distinguishing features.

8. In re-framing the issue on appeal and arguing in support of the trial court's ruling, PNI contends all of Griffis's e-mails are public records based, inter alia, on his high, visible position as former county manager, his salary and administrative budget, "the County's investigation into his alleged embezzlement and unauthorized purchase of rifles," and the circumstances of his having "left office only after being placed on administrative leave by the Board of Supervisors." But neither the Public Records Law nor the Arizona cases interpreting it permit, let alone require, consideration of any such factors in determining whether a document is or is not a public record.

¶ 31 That Griffis generated or received the e-mails in question on a County computer system purchased with public funds and that the County possesses and controls the e-mails pursuant to its written policies does not necessarily make the e-mails public records. *See id.* at 538, 542, 815 P.2d at 907, 911. Rather, " '[i]t is the nature and purpose of the document, not the place where it is kept, which determines its status.' " *Id.* at 538, 815 P.2d at 907, *quoting Linder,* 152 N.W.2d at 835. As Griffis correctly points out, *Salt River* "rejected the notion that the location of a document or the fact that a document was created using public resources made the document a public record." Therefore, the trial court's ruling "that everything that is on a [Pinal County] computer ... is presumed to be a public record" is incompatible with *Salt River.*

¶ 32 Without question, *Salt River* is factually distinguishable, "involve[d] a unique intersection of federal and state law," and considered factors not present in this case. 168 Ariz. at 533, 815 P.2d at 902. But the court's extensive discussion and broadly stated principles relating to state public records law were not confined to the factual context presented in *Salt River.* Indeed, although the issue raised here was neither presented nor decided by this court in *Star Publishing,* we observed there that "[i]t may be that particular documents contained on the computer tapes are not public records within the meaning of *Salt River.*" 181 Ariz. at 434, 891 P.2d at 901. That statement, albeit dicta, would have been unnecessary and meaningless if *Salt River* was strictly limited to its facts. In other words, this court did not necessarily view *Salt River* as so restricted or anomalous.

¶ 33 We conclude that the e-mails in question, which both Griffis and the County characterized as personal, do not fall within any of *Salt River*'s three alternative definitions of public records. Neither PNI nor the County argues otherwise. And, as discussed below, *Carlson* does not compel a different conclusion.

### III

¶ 34 In urging a broad definition of public records, PNI and the County focus on the conclusion in *Carlson* that " § 39–121.01(B)

requires the keeping of records sufficient to provide the public with 'knowledge' of all of the activities of a public officer and of the manner in which he conducts his office and performs his duty." 141 Ariz. at 491, 687 P.2d at 1246. But that overlooks or minimizes the court's earlier, qualifying statements that § 39–121.01(B), "in effect, requires all officers to make and maintain records reasonably necessary to provide knowledge of all activities they undertake *in the furtherance of their duties,*" and that the presumption of public access and inspection applies to "all records *required to be kept* " under that statute. *Id.* at 490, 491, 687 P.2d at 1245, 1246 (emphasis added). Indeed, the court in *Salt River* succinctly summarized its prior holding in *Carlson* as follows: "sheriff's offense report regarding an assault by one inmate on another *was generated pursuant to his official statutory duty* and was subject to disclosure." *Salt River,* 168 Ariz. at 538, 815 P.2d at 907 (emphasis added).

¶ 35 As previously noted, our supreme court stated in *Salt River* that a document constitutes a public record if it "is 'required to be kept, or necessary to be kept in the discharge of a duty imposed by law or directed by law to serve as a memorial and evidence of something written, said or done.' " 168 Ariz. at 538, 815 P.2d at 907, *quoting Mathews,* 75 Ariz. at 78, 251 P.2d at 895. As also noted earlier, § 39–121.01(B) mandates that "[a]ll officers and public bodies shall maintain all records ... reasonably necessary or appropriate to maintain an accurate knowledge of their official activities *and of any of their activities which are supported by monies from the state or any political subdivision of the state.*" (Emphasis added.) Relying on the highlighted language, "as construed by *Carlson,*" PNI argues § 39–121.01(B) applies not only to records of official activities but also "records of *any* other activities of a public officer that are supported with taxpayer funds." Therefore, PNI asserts, the e-mails fall under § 39–121.01(B) and constitute public records because they are "necessary to provide the public with knowledge of Griffis' activities in office and his use (or misuse) of public resources."

¶ 36 As interpreted by our supreme court in *Carlson*, however, § 39–121.01(B) only "requires the keeping of records sufficient to provide the public with 'knowledge' of all of the activities of a public officer and of the manner in which he conducts his office and performs his duty." 141 Ariz. at 491, 687 P.2d at 1246. Contrary to PNI's assertions, the content of Griffis's personal e-mails is not necessary to provide the public with knowledge of his county-supported activities. The activities at issue here were Griffis's acts of writing and sending the e-mails. And the log that the County provided of all of Griffis's e-mails sent and received during the relevant time frame could provide adequate knowledge of those activities.

¶ 37 The content of the e-mails, in contrast, is merely a record of Griffis's personal affairs and falls outside the scope of information necessary for the public to have knowledge of "the manner in which he conducts his office and performs his duty." *Id.* As our supreme court stated in *Salt River*, "a public record must also have some relation to the official duties of the public officer that holds the record." 168 Ariz. at 538, 815 P.2d at 907. We see no such relation between Griffis's purely personal e-mails and his official duties as county manager. *See State v. Clearwater*, 863 So.2d 149, 151 (Fla.2003) (rejecting argument that "placement of e-mails on the City's computer system makes the e-mails public records, regardless of their content or intended purpose"); *cf. Denver Publ'g Co. v. Board of County Comm'rs*, 121 P.3d 190, 199, 203 (Colo.2005) (that a government official "sent or received a message while compensated by public funds or using publicly-owned computer equipment is insufficient to make the message a 'public record' " under Colorado's statutory scheme; rather, content of e-mail message must reveal "a demonstrable connection to the performance of public functions or involve the receipt or expenditure of public funds"); *Tiberino v. Spokane County*, 103 Wash.App. 680, 13 P.3d 1104, 1108, 1110 (2000) (personal e-mails of discharged public employee deemed public records when print-

ed by county/employer "in preparation for litigation over her termination, a proprietary function," but ruled exempt from disclosure when content of e-mails "personal and . . . unrelated to governmental operations").

¶ 38 We also note that the 1975 enactment of § 39–121.01 occurred long before the development and current, prevalent use of e-mail in government offices.[9] *See Denver Publ'g Co.*, 121 P.3d at 198 ("[B]y 1996 e-mail served a significant role in day-to-day business matters" and also "gave employees and employers the ability to take care of personal and family matters quickly and efficiently without having to leave the office."). Likewise, *Carlson* and *Salt River* both involved documents that were very different from the e-mails at issue here. As the dissent noted in *Star Publishing*, this is an area "where technology has once again outpaced the law." 181 Ariz. at 435, 891 P.2d at 902. But, considering other, more traditional forms of communication, we seriously question whether our Public Records Law was meant to apply to purely personal e-mails.

¶ 39 In holding that personal e-mails transmitted or received by public employees on a government-owned computer system were not subject to disclosure under Florida's public records statute, the Florida Supreme Court asked:

> If the Attorney General brings his household bills to the office to work on during lunch, do they become public record if he temporarily puts them in his desk drawer? If a Senator writes a note to herself while speaking with her husband on the phone does it become public record because she used a state note pad and pen?

*City of Clearwater*, 863 So.2d at 154. Florida's law differs from Arizona's, but we have no reason to believe that Arizona's legislature intended those "absurd consequences of such an application of the law," *id.*, and we do not interpret § 39–121.01(B) to so provide.

---

9. A 2002 Pew Foundation research study found that sixty-two percent of all employed Americans had access to the internet and nearly all of them use e-mail at work. And, sixty-three percent of work e-mailers said that they found e-mail more

effective than using the telephone for making arrangements and appointments. Deborah Fallows, *Email at Work*, ww w.pewinternet.org/pdfs/PIP_Work_Email_Report.pdf (last visited July 19, 2006).

¶ 40 Although e-mails appear in document format, in many ways their purpose and widespread use in today's society are analogous to a telephone call.[10] *See Denver Publ'g Co.*, 121 P.3d at 198 ("use of e-mail present[s] a complex issue given the unique properties of e-mail messaging" and "given that e-mail shares the private characteristics of telephonic communication"). Because of their transitory nature, the content of telephone calls generally would not be considered a public record. In our view, it defies logic to believe the legislature intended to require every state officer or employee, for purposes of disclosure on a public records request, to record the content of all of his or her personal telephone calls or to create and maintain documentation of all activities, whether business-related or strictly personal, in which he or she engages on the job. It would be just as illogical to infer any such intent with respect to electronic forms of communication that are purely personal in nature, even though e-mails are essentially self-documenting and easily retained.

¶ 41 In sum, we agree with Griffis that "a reading of the entire opinion in *Carlson* [indicates] that the court defines public records as documents related to the duties of the public officer" and that "Griffis' personal e-mails are not reasonably necessary to provide knowledge of the activities [he] undertook in furtherance of his duties as County Manager." As the court stated in *Salt River*, "the public has no right of access to private records located in government offices that have no relation to the agency's activities." 168 Ariz. at 541, 815 P.2d at 910; *see also City of Clearwater*, 863 So.2d at 154 ("The determining factor is the nature of the record, not its physical location."). To the extent *Carlson* and *Salt River* might be inconsistent in any respect, we follow *Salt River* as it is our supreme court's most recent pronouncement on the topic of what does or does not constitute a "public record." [11]

## IV

¶ 42 PNI alternatively argues that even if *Salt River* applies, the e-mails in question are "other matters" within the meaning of § 39–121. We are not persuaded. The record does not establish that personal e-mails of County employees such as Griffis are "held in the official capacity of [a governmental] officer." *Salt River*, 168 Ariz. at 539, 815 P.2d at 908. In addition, as Griffis points out, the County's e-mail policy required "formal communications" to be maintained, but personal e-mails do not fall within that definition.[12] Nor do personal e-

10. A 1995 journal reported:

> E-mail is a medium that has come to replace both telephone calls and paper documents for many purposes. The applicability of public disclosure laws to e-mail, however, is less than clear. Telephone conversations by public employees for most purposes are confidential, while paper records created by those same employees can be requested under the [Freedom of Information Act].

Daniel F. Hunter, *Electronic Mail and Michigan's Public Disclosure Laws: The Argument for Public Access to Governmental Electronic Mail*, 28 U. Mich. J.L. Reform 977, 977 (1995). Arizona's (and other states') public records laws, including the 1975 amendments to § 39–121.01, were enacted

> when information traveled in basically two media: paper memoranda (letters) and telephone calls. In general, paper memoranda were considered public records, and telephone calls were considered private conversations. Today, e-mail has bridged those media. E-mail correspondence is like a telephone conversation in that most messages are short, casual, and can travel around the world in minutes. At the same time, e-mail messages are like written memoranda because they can be copied, edited, filed, and printed onto paper. E-mail is a medium that has come to replace both telephone calls and documents for many purposes.

*Id.* at 978–79.

11. At oral argument, PNI referred us to *Cox Arizona Publications, Inc. v. Collins*, 175 Ariz. 11, 852 P.2d 1194 (1993), and *Bolm v. Custodian of Records of the Tucson Police Department*, 193 Ariz. 35, 969 P.2d 200 (App.1998). In both cases, however, it was undisputed that the documents requested were public records. *See Cox*, 175 Ariz. at 14, 852 P.2d at 1198; *Bolm*, 193 Ariz. at 38, 969 P.2d at 203.

12. Under a section labeled "Retention Schedules," the County's e-mail policy provided that "[f]ormal communications transmitted or received through electronic mail shall be either printed, and preserved in the appropriate file in permanent paper format ..., or saved to an electronic file and preserved." But the e-mail policy defined "formal communications" as "communications of any kind pertaining to public business, which must be preserved as a public record."

mails "'relate to matters essential to the general welfare of taxpayers,'" as that phrase was discussed in *Salt River.* 168 Ariz. at 539, 815 P.2d at 908, *quoting Mathews,* 75 Ariz. at 80, 251 P.2d at 896. Because "[t]he term 'other matters[ ]' ... includes only *public* matters" and "does not include records that reveal only the private affairs of citizens," *id.,* Griffis's personal e-mails do not constitute "other matters" within the meaning of § 39–121.

## V

¶ 43 Our supreme court has noted "the strong policy favoring open disclosure and access" to government documents. *Cox Ariz. Publ'ns, Inc. v. Collins,* 175 Ariz. 11, 14, 852 P.2d 1194, 1198 (1993). Consequently, Arizona law recognizes a "legal presumption favoring disclosure" of public records. *Id.* It is equally clear that a party challenging disclosure bears the burden of overcoming that presumption by, for example, "specifically demonstrat[ing under the *Mathews/Carlson* balancing test] how production of the documents would violate rights of privacy or confidentiality, or would be 'detrimental to the best interests of the state.'" *Cox,* 175 Ariz. at 14, 852 P.2d at 1198; *see also Scottsdale Unified Sch. Dist. No. 48 v. KPNX Broadcasting Co.,* 191 Ariz. 297, ¶ 9, 955 P.2d 534, 537 (1998).

¶ 44 The legal presumption and balancing test, however, only apply if the documents in question constitute "public records" or "other matters." The trial court erred in merely presuming that all of Griffis's personal e-mails were public records when neither PNI nor the County established, as a matter of fact or law, that the documents should be so characterized. Absent any threshold showing or determination that the e-mails in question constituted either public records or other matters, the trial court also erred in

withholding disclosure only if Griffis carried the burden of "overcoming the public records presumption" and of "demonstrating that [the e-mails] should be protected" based on countervailing concerns of confidentiality or cognizable harm. In view of these conclusions, we do not address the federal and other out-of-state cases or Arizona Attorney General opinions Griffis cites, nor do we delve further into the parties' various, competing public policy arguments, which unquestionably support each party's position. *See Mitchell v. Gamble,* 207 Ariz. 364, ¶ 34, 86 P.3d 944, 953 (App.2004) ("Although public policy arguments can be made for or against the result we reach, our conclusion hinges solely on ... legal principles.").

## VI

¶ 45 One final issue, however, deserves serious consideration and discussion. The County asserts Griffis's e-mails "are public records" under not only Arizona law but also "as a result of their creation or reception on [C]ounty equipment using [C]ounty internet access, under then existing [C]ounty policies." Under those policies, Griffis lacked any expectation of privacy in e-mails he sent or received on the County's computer system.[13] *See* ¶ 2, *supra.* He essentially acknowledges that fact.

¶ 46 In addition, pursuant to its policies, the County owned all e-mail data and reserved the right to review, access, and disclose e-mail records. Indeed, the County's Internet access policy stated that data transmitted or received via the County's computer system is considered "official records ... and, as such, may be subject to disclosure to law enforcement or other third parties." With respect to any disclosure to third parties, however, both policies provided: "The contents of electronic mail (or Internet data) properly obtained for legitimate business

---

**13.** As noted earlier, *see* ¶ 2 and n. 1, *supra,* the County's own policies not only defined "public records" in a manner that tracked the three-part definition set forth in *Mathews* and *Salt River,* but the e-mail policy also provided that e-mail messages "are considered Public Records, unless they fall into one of three exemption categories: (1) Confidentiality, (2) Personal Privacy, or (3) Best Interest of the State." That latter provision, however, conflates the definition of "public records" with the recognized exemptions from disclosure of public records. Moreover, to the extent the County's own policies seek to define public records differently or more broadly than does state law, those policies "'did not and could not alter the [state law] definition of public records'" or otherwise broaden PNI's rights to inspection under Arizona's public records law. *State v. City of Clearwater,* 863 So.2d 149, 154 (Fla.2003), *quoting Times Publishing Co. v. City of Clearwater,* 830 So.2d 844, 846 (Fla.Ct.App. 2002).

purposes may be disclosed without the notice or permission of the sender." Although that provision is not totally clear, and the County contended otherwise at oral argument in this court, one could reasonably infer from that language that if e-mails or other data do not relate to "legitimate business purposes," the County would not voluntarily disclose such items to third parties without notice and permission of the sender.

¶ 47 In any event, we need not decide that issue because, on this record, we cannot uphold the trial court's order based solely on the County's internal policies when the court neither addressed nor relied on them. *See Logerquist v. Danforth,* 188 Ariz. 16, 23, 932 P.2d 281, 288 (App.1996) (appellate court generally affords trial court first opportunity to address and rule on issues). Although those policies clearly prescribed the e-mail-related rights and duties of Pinal County and Griffis, PNI and other third parties have no rights under those policies. Moreover, the record reflects the County did not choose to voluntarily produce the e-mails in question to PNI pursuant to any alleged authority to do so under its own internal policies. Rather, after PNI accused the County of having violated the Public Records Law by initially "withholding and redacting" many of the e-mails it produced, the County, without referring to its own policies, merely informed Griffis it would release the records pursuant to PNI's public records request "unless otherwise directed by an appropriate court order." When Griffis responded that "many of those documents are not subject to the public records law" and that the County "probably lacks the authority to even turn over these documents," the County responded that, despite "understand[ing Griffis's] concerns," it felt it had "no choice under the provisions of the Arizona Revised Statutes but to release the documents" absent a court order dictating otherwise.

¶ 48 The County later joined in PNI's motion to dissolve the preliminary injunction, stating, pursuant to its internal policies, "even personal emails if created or received on the Pinal County email system, are public property and subject to disclosure in response to a properly made public records request." But the County did not assert, and still does not clearly argue, that it chose to voluntarily produce to PNI all of the disputed e-mails based solely on its internal policies. If the County now chooses to change its position on that point, the effectiveness or validity of any such change can and should be litigated in the first instance at the trial court level. *See Premier Fin. Serv's v. Citibank (Ariz.),* 185 Ariz. 80, 86, 912 P.2d 1309, 1315 (App.1995) ("We cannot consider issues and theories that were not presented to the court below.").

¶ 49 This is not to say the County's policies have no meaning or effect. For example, Griffis points out that "nothing in [his] arguments here would preclude the County, as [his former] employer, from determining whether he [was] spending an excessive amount of work time on personal business." As he acknowledges, "the County has unfettered access to its own e-mails. If the personal e-mails are arguably relevant to the County's investigation of Griffis, the County has them and can review them." Therefore, as Griffis also states, this case does not "address the County's right as an employer to monitor its employees' use of its email system," nor does it "implicate the rights of law enforcement agencies to have access to a public employee's e-mails as part of a criminal investigation."

¶ 50 Finally, as it did below, the County argues the redacted portions of a particular e-mail Griffis sent on November 7, 2005 at 1:03 p.m. should be produced "because it is a public record as the result of its inclusion of county business." Griffis seems to recognize that a public employee whose e-mails are requested under the Public Records Law would not have unilateral authority to determine which e-mails "are personal and unrelated to County business." Rather, he apparently acknowledges the government employer's right to "review and ultimately determine what e-mails are related to public business and are responsive to a public records request." [14] Therefore, because the No-

---

14. In the event of a disagreement between a public employer and his or her employee about whether particular e-mails are strictly personal or have some relationship to official business, or if a third party has some basis to challenge the characterization, the trial court may decide that issue after an in camera inspection of the documents in dispute. *See Carlson v. Pima County,*

vember 7 e-mail indisputably contained some County-related information and the County does not characterize it as strictly personal, that e-mail should be produced.

### DISPOSITION

¶ 51 For the reasons set forth above, the trial court's order is affirmed to the limited extent it required production of the November 7 e-mail in its entirety. The balance of the trial court's order that required production of the other e-mails in dispute is reversed.

Concurring: J. WILLIAM BRAMMER, JR. and PETER J. ECKERSTROM, Judges.

141 Ariz. 487, 491, 687 P.2d 1242, 1246 (1984). Although the County requested an in camera inspection of the disputed e-mails that both Griffis and the County characterized as strictly per-

sonal, Griffis and PNI did not; and the trial court did not conduct any such inspection despite offering to do so.